## COMMONWEALTH vs. PAUL P. DUBOIS.

Barnstable. January 11, 2008. - March 31, 2008.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & BOTSFORD, JJ.

*Practice, Criminal,* Assistance of counsel, Required finding, New trial, Costs, Capital case. *Constitutional Law,* Assistance of counsel, Waiver of constitutional rights. *Homicide. Evidence,* Exculpatory, Expert opinion, Tape recording.

A Superior Court judge properly denied a criminal defendant's motion to sup-press statements that the defendant made to police about the victim's photograph, where the defendant failed to demonstrate that prior to making those statements, he had made more than an ambiguous or equivocal request for counsel, or had exhibited, through his silence, an expressed unwillingness to continue with police questioning. [24-26]

At the trial of an indictment charging murder in the first degree by reason of deliberate premeditation, a Superior Court judge properly denied the defendant's motion for a required finding of not guilty, where there was sufficient evidence for the jury to find deliberation and premeditation, a decision to kill, and a killing in furtherance of the decision. [26-28]

In a murder case, no substantial likelihood of a miscarriage of justice arose from the judge's implicit denial of the defendant's posttrial motion for an order requiring the Commonwealth to provide exculpatory evidence (a tape recording), in support of which the defendant filed an affidavit stating that he told his trial counsel's investigator about the recording, where the judge implicitly found the defendant's affidavit not credible, where there was no explanation why the defendant did not raise the issue with his trial attorney at trial or during a hearing on another motion, and where there was no other evidence to support the defendant's assertion that he told trial counsel's investigator about the recording; however, because the Commonwealth's answer to the defendant's request for information about the alleged tape recording was not adequate, this court permitted the defendant to file a motion to compel the Commonwealth to answer the specific questions raised in his motion concerning the tape recording. [28-30]

No substantial likelihood of a miscarriage of justice arose from a Superior Court judge's denial of a criminal defendant's motion for a new trial, based on the defendant's criticisms of the Commonwealth's handwriting expert's testimony and credibility, where the evidence offered by the defendant in support of his motion went only to the credibility of the expert and was not newly discovered; further, given that the defendant did not raise a substantial issue, the judge's failure to hold an evidentiary hearing on the motion for a new trial did not create a substantial likelihood of a miscarriage of justice. [30-32]

No substantial likelihood of a miscarriage of justice arose from allegedly unfairly presented expert evidence at a murder trial, where the suggestion that such evidence likely had a significant impact on the jury's deliberations was pure speculation. [32-33]

A Superior Court judge did not abuse his discretion in denying a criminal defendant's motion for funds to pay for an expert he used as the basis for his motion for a new trial, where the motion judge found that there was no basis to conclude that justice may not have been done. [33]

INDICTMENT found and returned in the Superior Court Department on July 7, 2003.

The case was tried before *Margaret R. Hinkle*, J., and post-trial motions were considered by her.

*Stephen Paul Maidman* for the defendant.

*Julia K. Holler*, Assistant District Attorney, for the Commonwealth.

IRELAND, J. In 2004, a Barnstable County jury convicted the defendant of murder in the first degree of the victim, a social worker for the Department of Social Services (department), based on deliberate premeditation.[1] The defendant appealed. In 2005, the defendant filed three motions in this court, including a motion for a new trial, which were remanded to the Superior Court. The motion for a new trial was denied without a hearing in 2007. The defendant again appealed and the appeals were consolidated. The defendant claims that the judge erred in denying his motions to suppress and for a required finding of not guilty, and in denying his three posttrial motions. Because we conclude that, on the record before us, there is no merit to the defendant's claims of error and see no reason to exercise our discretion pursuant to G. L. c. 278, § 33E, we affirm the defendant's conviction. However, we permit the defendant to file a motion to obtain information concerning a tape recording he claims was made of his conversation with police in 1997.

*Facts.* We recite the facts the jury could have found, reserving certain details for our discussion of the issues raised.

In 1996, the defendant and his former wife were involved in

---

[1] A grand jury also indicted the defendant for defacing a firearm. That charge was severed from the murder charge. After the defendant's conviction the Commonwealth entered a nolle prosequi of this charge.

a custody dispute over their two children. The victim testified at a Probate and Family Court hearing. After the hearing, the defendant saw his former wife and the victim embrace. The defendant said to his then girl friend, "Look, they're hugging . . . . They're buddies." In a written decision issued in August, 1996, the probate judge referenced the victim's testimony that all allegations of abuse by the former wife were unsupported and the allegations of neglect by the defendant were supported.[2] The defendant was granted visitation but the couple's previously shared legal custody of the children ended, with his former wife being awarded full legal custody.

At approximately 7:30 P.M. on September 12, 1996, the victim was found lying between two cars in the parking lot of a Provincetown convenience store with a pool of blood around her head. One of the cars was the victim's and had the key in its door. The victim had suffered a fatal gunshot to the back of the head below the left ear. The projectile was recovered from her right temple.

A witness who lived near the store heard a loud bang. She went outside to her gate and saw a figure with short dark hair and wearing a yellow raincoat and dark pants running down the street. She heard a car door open and close; she heard a vehicle start up, and then saw it being driven the wrong way on her one-way street. The witness testified that the vehicle was a dark color and the headlights seemed higher than an automobile's would be. The witness walked with the police officer, who had responded to the incident, to the spot where she believed the vehicle was parked. Although it was misty, the spot the witness pointed out was dry. Another witness heard a loud "pop." He then heard a very loud vehicle driving off very fast. He said that the vehicle looked like a pickup truck and was a dark color.

The defendant's girl friend testified that when the defendant arrived home on the evening of the murder, he was "distraught" and wearing only a T-shirt and "long johns." He told his girl friend that his clothes got dirty at work. The defendant also stated, over and over, "God forgive me. I'm sorry I did this to you." He also said, "What have I done?" and told her that it

---

[2]The written decision of the Probate and Family Court judge was admitted in evidence for the limited purpose of showing the defendant's motive.

was "about the kids." Among the vehicles the defendant drove at the time was a blue or black truck. The defendant left the house he shared with the girl friend, returning seven to eight minutes later.[3]

In January, 1997, when the girl friend told the defendant that police wanted to speak to him about the victim's murder, he said, "Well I was home for dinner. You know I was home." The girl friend said that she could not say for sure. In his interview with police in 1997, the defendant stated that he had parked his truck near the store on September 12, and he walked by the murder scene between 8 and 8:30 P.M. but most everything was over at that time. The defendant also stated that his "children got screwed" by the department, although he was mad at the department and not the victim. He stated that he bought and sold a gun in Virginia. The defendant had lived and worked in Virginia in 1994.

In 2000 or 2001, the defendant and his girl friend were in the Probate and Family Court and the defendant was crying. Because of his demeanor, the girl friend said, "It's almost like you killed that woman." The defendant responded, "Wouldn't you like to know?"

The defendant and his girl friend ended their relationship in 2002. The girl friend, who in 1997 had told police that the defendant did not have a gun, contacted police after her mother showed her evidence that the defendant had a gun in 1994.[4] The girl friend searched through her house and gave police papers and other items belonging to the defendant, including a gun.[5] A ballistics expert testified that the rifling system used to fire the bullet that killed the victim was not very common in this area. The defendant had bought two guns in Virginia in 1994, one of which could have been used in the shooting.

It was the defendant's practice to make lists of what he would

---

[3]The girl friend testified that she memorialized these events on a piece of paper but forgot about it until she found the paper in 2002.

[4]In 1994, the girl friend's mother found two guns in a pile of laundry belonging to the defendant and her daughter. She wrote the serial number from each gun on a piece of toilet paper and put it away. In 2002, she came across the paper again and brought it to her daughter.

[5]That particular gun was not used in the murder; it was one of the guns he purchased in Virginia.

do each day. In the box of items that the girl friend turned over to police was a so-called "reverse writing"[6] that was identified by both the girl friend and his former wife as the defendant's handwriting. It stated:

> "I'VE HAD IT I'm ALL DONE
> Fucking DONE!
> I'll make a fucking decision
> DSS Case Worker Screened out!"[7]

Another writing of the defendant's that was written in 1996 also was admitted in evidence. It mentioned the victim's name as well as listing things to search for about her, including "number," "vehicle," and "friends." The note also mentioned the name of the bar the victim visited on the evening she was shot.

The defendant was arrested in 2003. During an interview with State police, one of the troopers showed the defendant a photograph of the victim. The defendant stated, "You can't make me look at it. I don't have to look at it." The defendant's right leg was twitching and shaking.

*Discussion.* 1. *Motion to suppress.* The defendant claims that the judge erred in denying his motion to suppress the statements he made to police in 2003 about the victim's photograph because, prior to making those statements, he had invoked his right to counsel.[8] There was no error.

When a suspect in custody makes an unequivocal and unambiguous request for counsel, all questioning must cease. *Commonwealth* v. *Contos*, 435 Mass. 19, 29 (2001). However, if the request is ambiguous or equivocal, questioning may continue. *Id.* "For the rule of *Miranda* [v. *Arizona*, 384 U.S. 436 (1966),] regarding the termination of questioning to apply, there must be an expressed unwillingness to continue or an af-

---

[6]The particulars of this reverse writing are discussed *infra.*

[7]In 1996, the department used the terms "screened in" and "screened out" when, after an initial investigation, it determined whether to assign the case or to take no further action.

[8]The defendant also argues that testimony about his demeanor while making the statements should have been suppressed and that he was prejudiced by the prosecutor's referencing the entire incident in closing argument and asking, "Are those the actions of an innocent man?"

firmative request for an attorney." *Commonwealth* v. *Pennellatore*, 392 Mass. 382, 387 (1984).

Here, the two State troopers who interviewed the defendant testified at the hearing on his motion to suppress that, after the defendant stated that he understood the Miranda warnings he was given, they told him that they were there to discuss the victim. The defendant said, "This sounds serious. Maybe I better get a lawyer." One of the troopers then asked the defendant if he did want a lawyer. The defendant did not respond.[9] He also did not respond to questions whether he had bought some guns and whether he had killed the victim. The defendant only spoke when one trooper showed him the victim's photograph, stating, "You can't make me look at that. This is abuse. I don't have to look at it. I want a lawyer."[10] The judge found that, because the defendant used the word "maybe" in his first reference to a lawyer, he was not invoking his right to counsel. See *Commonwealth* v. *Todd*, 408 Mass. 724, 726 (1990) (no affirmative request for counsel where defendant "wondered aloud about the advisability of having a lawyer"); *Commonwealth* v. *Corriveau*, 396 Mass. 319, 331 (1985) (no affirmative request for counsel where defendant stated, "It's beginning to sound like I need a lawyer"); *Commonwealth* v. *Pennellatore, supra* (defendant's comment, "I guess I'll have to have a lawyer for this" acknowledges seriousness of charges rather than affirmative request for attorney).

The defendant argues that his lack of response to the question whether he wanted an attorney was a demonstration of an "expressed unwillingness" to continue.[11] In *Commonwealth* v. *Sicari*, 434 Mass. 732, 747-749 (2001), cert. denied, 534 U.S. 1142 (2002), this court considered, for the first time, whether a defendant's long period of silence between questions he was asked by police constituted an expressed unwillingness to continue with the questioning. In the *Sicari* case, the judge found that the defendant's silence was so that he could think. We

---

[9]The defendant does not dispute that the judge implicitly found that the defendant was asked whether he wanted a lawyer.

[10]The questioning ceased after the defendant stated that he wanted a lawyer.

[11]At the hearing, one trooper testified that the defendant folded his arms after being asked whether he bought guns in Virginia. This occurred approximately halfway through the interview.

upheld that conclusion but stated that we would evaluate silence on a case-by-case basis.

Here, the judge made no explicit finding concerning the defendant's silence. However, the defendant did not respond at all when the trooper specifically asked him whether he wanted a lawyer. In addition, unlike *Commonwealth* v. *Sicari, supra* at 741, 748, where the defendant spent thirty to forty minutes in silence in the middle of the two and one-half hours during which he was questioned by police, here the troopers estimated that the total amount of time they spent questioning the defendant until he stated that he wanted a lawyer and the interview was concluded was approximately ten to fifteen minutes. Given these circumstances, we do not interpret the defendant's silence as an *expressed* unwillingness to continue questioning. See *Commonwealth* v. *Roberts*, 407 Mass. 731, 734 (1990), quoting *Commonwealth* v. *Pennellatore, supra* at 387 (defendant's refusal to answer questions not "*expressed* unwillingness to continue"). The judge's decision that the defendant validly waived his Miranda rights was warranted by the evidence.

2. *Motion for a required finding of not guilty.* The defendant argues that the judge erred in denying the motions for a required finding of not guilty he made at the close of the Commonwealth's evidence and at the close of all evidence. In considering the denial of a motion for a required finding of not guilty, the reviewing court must determine whether the evidence offered by the Commonwealth and the reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth, were sufficient to persuade a rational jury of the existence of all the elements of the crime charged beyond a reasonable doubt. *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979), quoting *Commonwealth* v. *Sandler*, 368 Mass. 729, 740 (1975). See *Commonwealth* v. *Chhim*, 447 Mass. 370, 377 (2006) (all permissible inferences are drawn in favor of Commonwealth). See also *Commonwealth* v. *Merola*, 405 Mass. 529, 533 (1989), quoting *Commonwealth* v. *Beckett*, 373 Mass. 329, 341 (1997) (inferences "need only be reasonable and possible[, not] necessary or inescapable"). "Circumstantial evidence alone may be sufficient to meet this burden. [*Commonwealth* v. *Platt*, 440 Mass. 396, 401 (2003).] See *Commonwealth* v. *Rojas*, 388 Mass.

626, 629 (1983). 'We consider the state of the evidence both at the close of the Commonwealth's case and at the close of all the evidence.' " *Commonwealth* v. *Nolin*, 448 Mass. 207, 215 (2007), quoting *Commonwealth* v. *Palmariello*, 392 Mass. 126, 142 (1984).

In order to prove murder in the first degree based on deliberate premeditation, the Commonwealth had to prove that the victim's killing was unlawfully committed with malice. Murder with deliberate premeditation requires the Commonwealth to prove deliberation and premeditation, a decision to kill and a killing in furtherance of the decision. *Commonwealth* v. *Duran*, 435 Mass. 97, 111-112 (2001), quoting *Commonwealth* v. *Jenks*, 426 Mass. 582, 585 (1998).

Here, viewing the evidence in the light most favorable to the Commonwealth, there was sufficient evidence for the jury to conclude that the defendant was guilty beyond a reasonable doubt. Through his writings, and through his statements to his girl friend about his former wife and the victim being "buddies" and to police that the department had "screwed" his children, they reasonably could have inferred that he was angry about the victim's testimony at the custody hearing. In 1994, he had bought a gun that could have been used in the shooting. Moreover, in his 1997 statement to police, although the defendant claimed to have bought and sold one gun in Virginia, the Commonwealth introduced evidence that he bought two guns in Virginia, one of which was found by the girl friend in 2002. The jury reasonably could have concluded that the defendant was not being truthful about his gun ownership because he had something to hide.

The jury also could infer that he was guilty because he came home on the night of the murder in only his underwear, was distraught, and said, among other things, "God forgive me," and "What have I done?" The jury reasonably could have inferred that when he left his home and returned several minutes later that he was disposing of evidence. Moreover, in 1997, when the defendant was going to be interviewed by police, he tried to convince his girl friend that he was home on the evening of the murder. When she said that she could not be sure, the jury reasonably could infer that he ended up telling police that he was in the area of the murder on September 12, in case he had been seen.

Nor did the Commonwealth's case deteriorate once the defendant presented his case, and he does not argue otherwise. See *Commonwealth* v. *Morgan*, 449 Mass. 343, 349 (2007), quoting *Commonwealth* v. *Sheline*, 391 Mass. 279, 283 (1984). Deterioration only occurs where the Commonwealth's evidence of necessary elements "is later shown to be incredible or conclusively incorrect." *Commonwealth* v. *O'Laughlin*, 446 Mass. 188, 203 (2006), quoting *Kater* v. *Commonwealth*, 421 Mass. 17, 20 (1995).

The defendant argues that we should focus (here and in our review pursuant to G. L. c. 278, § 33E) on the "sufficiency, weight, and . . . the dubious quality of the circumstantial evidence." The weight and credibility of the evidence is the province of the jury. *Commonwealth* v. *Nardone*, 406 Mass. 123, 129-130 (1989). See *Commonwealth* v. *Wilborne*, 382 Mass. 241, 245 (1981), quoting *Commonwealth* v. *Amazeen*, 375 Mass. 73, 81 (1978) (where conflicting inferences from evidence possible, jury determine truth). There was no error.

3. *Posttrial motions*. a. In 2005, the defendant filed a motion for an order requiring the Commonwealth to provide exculpatory evidence. The motion specifically asked the Commonwealth to disclose whether, as the defendant stated in his affidavit in support of the motion, a tape recording of his 1997 conversation with police exists, and referred to the information about the tape recording as "previously undisclosed material evidence." The defendant asked to be provided with a copy of the tape recording if it exists or an accounting for the tape recording if it existed but is no longer available. In his affidavit, the defendant states that the recording will prove that he did not tell police that he was near the murder scene on September 12. The defendant claims that he told his trial counsel's investigator about the tape recording prior to his trial. Trial counsel did not seek to suppress the 1997 statements, although, as discussed *supra*, he did seek to suppress statements from the 2003 interview.

The defendant argues that the motion judge, who also was the trial judge, erred in denying the motion. The judge never formally ruled on the motion. In a letter to an assistant district attorney she "required" the Commonwealth to respond to all of the defendant's posttrial motions. The Commonwealth filed an

affidavit from the prosecutor in the defendant's case in response to the motion. In the affidavit, the prosecutor stated only, "I am aware of no potentially exculpatory evidence that was not turned over to trial counsel . . . ." At oral argument, the defendant's counsel stated that the reason he did not file a motion to compel the Commonwealth to address the existence of a tape recording is because he believed the judge was going to hold a hearing on all his motions.

The failure of a judge to rule on a motion is treated as an implicit denial. See *Commonwealth* v. *Rosado*, 450 Mass. 657, 659 (2008). Because the defendant's affidavit is the only evidence supporting his claim that a tape recording of his interview with police exists, we assume that the implicit denial of the motion indicates that the judge did not find the defendant's affidavit credible. See *Farley* v. *Sprague*, 5 Mass. App. Ct. 799, 800 (1977), *S.C.*, 374 Mass. 419 (1978), citing *Macera* v. *Mancini*, 327 Mass. 616, 621 (1951) ("bare denial of the motion does not permit us to assume the truth of any of the evidence in the affidavits"). See generally *Commonwealth* v. *Jones*, 432 Mass. 623, 633-634 (2000). The judge was not required to credit the affidavit, even if undisputed. See *Commonwealth* v. *Little*, 384 Mass. 262, 269 (1981); *Commonwealth* v. *Grace*, 370 Mass. 746, 752 (1976). See also *Commonwealth* v. *Thomas*, 399 Mass. 165, 167 (1987) (motion judge's discretion to determine credibility of affidavit, especially if judge also presided at trial). Here, where the judge implicitly found the affidavit not credible, where there is no explanation of the reason the defendant did not raise this issue with his trial attorney at trial or during the hearing on the motion to suppress, and where there is no other evidence to support the defendant's assertion that he told trial counsel's investigator about the recording, we conclude that there is no substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Caillot*, 449 Mass. 712, 725 (2007), quoting *Commonwealth* v. *Grace*, 397 Mass. 303, 306 (1986) (to be granted new trial, new evidence must have been unknown to defendant or his counsel at time of trial). The purpose of postconviction discovery is to allow a defendant to gather evidence to support a meritorious claim. *Commonwealth* v. *Daniels*, 445 Mass. 392, 406 (2005), quoting 4 ABA Standards for

Criminal Justice, Postconviction Remedies Commentary to Standard 22-4.5, at 22-48 (2d ed. 1986).

Although we find no substantial likelihood of a miscarriage of justice on the record before us, we agree with the defendant that the Commonwealth's answer to the defendant's request for information about the alleged tape recording was not adequate. Moreover, at oral argument, the Commonwealth was unable to shed further light on the question whether a tape recording exists. Therefore, the defendant may, if he chooses, file a motion to compel the Commonwealth to answer the specific questions he raised in his motion concerning the tape recording.

b. The defendant filed a motion for a new trial claiming that the testimony of the handwriting expert the Commonwealth used to decipher the reverse writing created a substantial likelihood of a miscarriage of justice and violated his Federal and State constitutional rights to a fair trial. He also argues that it was error for the judge to deny him an evidentiary hearing on the matter.[12]

The decision to grant a motion for a new trial rests soundly within the judge's discretion and "will not be reversed unless it is manifestly unjust or . . . the trial was infected with prejudicial constitutional error." *Commonwealth* v. *Nieves*, 429 Mass. 763, 770 (1999). Moreover, we give "special deference to the decisions of a judge who was, as here, the trial judge." *Commonwealth* v. *Murphy*, 442 Mass. 485, 499 (2004). Because the denial of the motion for a new trial is being considered " 'in conjunction with [the] defendant's direct appeal from a conviction of murder in the first degree,' we must determine whether, under G. L. c. 278, § 33E, there was a substantial likelihood of a miscarriage of justice." *Commonwealth* v. *Morgan*, 449 Mass. 343, 353 (2007), citing *Commonwealth* v. *Hill*, 432 Mass. 704, 710 n.14 (2000).

When police were reviewing the items that the defendant's girl friend gave them in 2002, a document was found that had

---

[12]The defendant does not argue that he had ineffective assistance of counsel at trial because of the way his counsel handled the situation and does not argue that the Commonwealth deliberately introduced what he calls "highly misleading" testimony. He seeks our review under the substantial likelihood of a miscarriage of justice standard.

writing related to the department on one side and a faint reverse writing on the other side.[13] Police gave the document to an expert who scanned the document into her computer to reverse the image, raised the contrast, and printed it. The expert then compared this writing with known samples of the defendant's writing.

After a voir dire, the expert stated her opinion that the writer of the known samples "probably" wrote the reverse writing. On cross-examination, she agreed that " 'probable' is a qualified opinion." Defense counsel moved to exclude the enhanced printout of the writing and the expert's statement that the author of the writing "probably" was the same as the author of the known writings. During argument on the motion, defense counsel stated that his expert, who was not in the court room, would counter her testimony by stating, in essence, that her field of science could not support what she was saying. The judge stated that the testimony would be admitted, but limited to where a foundation was laid to show that her opinion was within the area of forensic science in which she operated. The judge stated that at issue was the weight of the evidence, not its admissibility.

The expert testified at trial, "It's my opinion that the writer of the known writing probably wrote the [reverse] writing." On cross-examination, defense counsel elicited from the expert that she preferred to work with original documents when comparing them to known ones; that she had only the reverse writing to examine in this case; that she could not determine whether the original writing from which the reverse writing was created was a fabrication; and that her opinion about the author of the reverse writing was a "qualified" one. In addition, in his closing, defense counsel, discussing the meaning of beyond a reasonable doubt, referred to the expert testimony and stated that "probable" was not enough.

In support of his motion for a new trial, the defendant submitted a 126-paragraph affidavit from Alan T. Robillard, the expert the defense had consulted during trial. As the judge found, Robillard stated that he had examined the known and reverse writings before trial and had determined that no opinion could be

---

[13]Reverse writing is often created when an original writing is pressed against another document, causing a transfer of the writing material.

formed about whether the reverse writing was the defendant's writing. He further stated, among other things, that, after reviewing the trial testimony of the Commonwealth's expert, he concluded that the Commonwealth's expert failed to follow established procedures when she performed her forensic tests on the writing. He stated, inter alia, that because reverse writing does not contain necessary fine details, an examiner cannot properly compare reverse to known writings; the reverse writing could not be determined to be a product of natural writing; and a computer enhancement process masks the "fine details needed for a reliable comparison."

The judge concluded that the defendant's argument that the testimony of the Commonwealth's expert was "erroneous, unreliable, highly misleading and 'inconsistent with the generally accepted body of knowledge and experience in the field of document examination' " failed because he offered no support for the proposition that "post-conviction criticism by one expert on the credibility of the trial testimony of another expert justifies allowance of a new trial motion." Indeed, in his brief to this court, the defendant cites no authority for this proposition. This is not newly discovered evidence, and even if it were, where such evidence goes to the credibility of witnesses, no new trial is required. *Commonwealth* v. *Toney*, 385 Mass. 575, 581 (1982). For this reason, the defendant did not raise a substantial issue; therefore the judge's failure to hold an evidentiary hearing on the motion for a new trial also did not create a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Arriaga*, 438 Mass. 556, 570-571 (2003) (within judge's sound discretion whether defendant raised substantial issue).

The defendant further contends that the Commonwealth's presentation of the expert testimony was "fundamentally unfair" and "must have profoundly impressed the jury and it likely had a significant impact on their deliberations" in violation of his State and Federal constitutional and due process rights. As the judge pointed out, this argument is purely speculative in light of trial counsel's affidavit stating that he made a strategic decision not to use his expert[14]; the vigorous cross-examination of the expert by trial counsel, which resulted in her admission that her

---

[14]Trial counsel's affidavit stated that he believed that the expert did not

opinion was "qualified"; the defendant's former wife and former girl friend, who independently identified the writing as the defendant's; and the instruction to the jury concerning how to evaluate the credibility of witnesses and their discretion to accept all, some, or none of an expert's opinion. There was no substantial likelihood of a miscarriage of justice.

c. The defendant also argues that it was an abuse of discretion and a violation of due process for the judge to deny, through inaction, his motion for funds to pay for the handwriting expert he used as the basis for his motion for a new trial. He brought his request for funds pursuant to G. L. c. 261, § 27C; Mass. R. Crim. P. 30 (c) (5), as appearing in 435 Mass. 1501 (2001); and his State and Federal constitutional rights to due process and equal protection of the laws, and to present a defense. There was no error.

General Laws c. 261, § 27C, does not cover the costs associated with a motion for a new trial. *Commonwealth* v. *Carter*, 429 Mass. 266, 269 (1999), and cases cited. See *Commonwealth* v. *Serino*, 436 Mass. 408, 415 (2002). Under rule 30 (c) (5) a judge has "discretion to allow the defendant costs associated with the preparation and presentation of a motion" for a new trial. Here, where, for the reasons stated above, the judge found that there was no basis to conclude that justice may not have been done, there is no abuse of discretion under rule 30 (c) (5). See *Commonwealth* v. *Bys*, 370 Mass. 350, 361 (1976), quoting *Davis* v. *Boston Elevated Ry.*, 235 Mass. 482, 502 (1920) (abuse of discretion only where no conscientious judge, acting intelligently, honestly could have taken view of motion judge). There also is no merit to the defendant's assertion that he was denied a defense where the ground for the motion is evidence impeaching the credibility of a witness, which, as discussed, did not raise a substantial issue. Cf. *Ake* v. *Oklahoma*, 470 U.S. 68, 76-77 (1985) (funds for independent psychiatric examination necessary for adequate defense); *Britt* v. *North Carolina*, 404 U.S. 226, 227 (1971) (transcripts necessary for adequate appeal).

4. *Review pursuant to G. L. c. 278, § 33E.* We have read the entire record pursuant to our duty under G. L. c. 278, § 33E,

---

actually give an expert opinion where she never stated that the reverse writing matched the defendant's.

and discern no reason to reduce the verdict or grant the defendant a new trial.

*Conclusion.* For the reasons set forth above, we affirm the defendant's conviction and affirm the denial of his three posttrial motions. We permit the defendant to file a motion to obtain information concerning a tape recording he claims was made of his conversation with police in 1997.

*So ordered.*