Krupp, Peter B., J.
After a 12-year-old girl complained that defendant Raul Ochoa committed an indecent assault and batteiy on her, defendant was arrested on February 13, 2013. He was booked at the Revere Police Department, later brought to an interrogation room for questioning, and ultimately gave the police a recorded statement. He now faces three charges of indecent assault and batteiy on a child under the age of 14.
The case is before me on Defendant’s Motion to Suppress (Docket #16), which seeks to suppress the statements defendant made during his interrogation at the Revere Police Department on February 13, 2013. After an evidentiary hearing on April 22, 2014, the motion is ALLOWED.
FINDINGS OF FACT
At the hearing on this motion, I heard testimony from five witnesses and received eight exhibits.[1] Based on the preponderance of the credible evidence, I find the following facts.
In the late afternoon of February 13, 2013, while he was at work, defendant was arrested by Revere Police Detective Lynn Romboli (“Romboli”) and members of the Massachusetts State Police pursuant to a warrant on charges that he had sexually assaulted a child. Upon locating defendant and placing him under arrest, Romboli recognized that defendant could not speak English. Defendant made hand gestures and motions to Romboli, but was unable to communicate in English. Defendant only went to school into the fifth grade. His only education was in El Salvador. He is unable to read or understand English.[2]
After placing defendant under arrest, Romboli transported defendant to the Revere Police Department. Once there, at approximately 7:49 p.m., defendant was booked by Revere Police Lt. Jeffrey Graff (“Graff’), who does not speak Spanish. Graff was assisted by Revere Police Officer Jorge Romero (“Romero”), who speaks Spanish. The booking process was videotaped. The videotape, however, was not produced at the hearing. The witnesses who were asked about its whereabouts could not shed any light on what had happened to the booking videotape.[3]
During the booking process, Graff and Romero reviewed with defendant the Revere Police Department suicide prevention guideline sheet. To complete that form, the officers received from defendant biographical information and information bearing on defendant’s susceptibility to considering or attempting suicide. They also reviewed with him a properly form, identifying the property taken from his person.
Finally, Graff and Romero reviewed with defendant a Miranda warning form that was printed in English. Romero, who translated the form from English to Spanish, had no specialized training in Spanish translation or Spanish language skills; had gone to school from grammar school through college in classes *154 taught in English, and knew Spanish principally from having spoken it at home. He admitted on cross examination that he could not translate into Spanish words in English such as “waiver” or “arrest warrant.” Romero admitted that he had no specialized training in translating Miranda warnings. Neither he nor Graff offered any explanation as to why Romero translated an English language version of the Miranda warnings to defendant during the booking process rather than simply reading a Spanish-language version of those warnings. I have no doubt that Romero did his best to translate the English version of the Miranda warnings for defendant during the booking process, but, as is evidenced by the later recorded interview with defendant, see, infra, at 5-6, there remained uncertainty in defendant’s mind at least as to the scope of his right to counsel.
After the Miranda warnings were translated, defendant was directed to sign an English version of the Miranda warning form, which he could not read. With respect to Question 6 (“Do you understand each of these rights I have explained to you?”) and Question 7 (“Having these rights in mind, do you wish to talk to us without a lawyer being present?”), Romero circled the word “YES.” After completing the booking process, defendant was put into a holding cell. Defendant was not questioned after booking and before he was brought to an interrogation room about 90 minutes later.
At or around 9:30 p.m., defendant was brought to an interrogation room in the Revere Police Department. The room was small. It contained a table and a few chairs. The questioning of defendant was recorded by audio and visual means. Present for the questioning of defendant were Revere Police Detective Jon-Richard Gibson (“Gibson”), who had been assigned to investigate the case; Romboli, who had more experience than Gibson conducting sexual assault interrogations;[4] and Revere Police Officer Carlos Amaro (“Amaro”), who Gibson called to interpret between English and Spanish.[5] Because of the small size of the room and the presence of three police officers, the participants were very close to one another in the room. Amaro and defendant were sitting only a few feet apart.
The police informed defendant that the interview was being recorded “verbally and visually.”[6] After stating to defendant certain facts about the situation,[7] to which defendant nodded his head in acknowledgement, Amaro asked defendant in Spanish if he could “understand and read English?” He shook his head and said “Nah.” I credit the testimony of Dr. Michael O’Laughlin (“O’Laughlin”) that defendant uses the terms “Nah” and “No” interchangeably to mean “no.” The video recording makes clear that when defendant says “yes,” he often also nods his head. When he says “no,” he often shakes his head back and forth (sometimes a lot and sometimes just a little).
Amaro then attempted to administer Miranda warnings to defendant. Although he had a Spanish language Miranda warning form at his disposal, I credit O’Laughlin’s testimony that the Spanish words spoken by Amaro appeared not to be simply an imprecise reading of a Spanish language form, but an incorrect translation of an English version.[8] Specifically, Amaro told defendant the following:
[B]efore asking you any question, it is my obligation to advise you of your rights. You had the right to remain silent. If you choose to speak, anything that you say can be used against you in a court or other proceeding. You have the right to re — , remain — before you consult with an attorney, before answering any question, and you can have him present during the interrogation. If you cannot hire an attorney, and want one, the state will assign one, without your expense.[9]
Amaro then asked defendant “Do you understand what I have said to you?” Rather than answering that question, defendant asked, “(b]ut, is that in court?” The following colloquy then ensued:
Off. Amaro: These here are the laws of Miranda.
Defendant: Uh-huh. There, in the, in the court?
Off. Amaro: Yes. You can have an attorney.
Defendant: Um-hmm.
Off. Amaro: The court will assign — the court will assign you an attorney, okay?
Defendant: Um, okay.
Exhibit 6 at 9-10; Exhibit 8. This colloquy would have left a reasonable person in defendant’s position with the impression that counsel would be appointed for defendant when defendant got to court.
Amaro then continued:
Do you understand what I have read to you — what I have said to you? You can also waive your right to an attorney and your right to remain silent, and you can answer a question, or make any, uh, statement that you wish. If you decide to answer questions, you can stop at any point to consult with a lawyer.
Amaro then posed his ultimate question: “Having these laws in mind, do you want to talk with us?” Defendant answered softly, “No, maybe with an attorney.” Exhibit 6 at 10; Exhibit 8. The audio on this line is not as clear as it could be. I am able to hear a first word spoken by defendant beginning with “n,” which I believe to be either “no” or “nah.” I credit O’Laughlin’s testimony in this regard.
My conclusion as to defendant’s “no” — or its functional equivalent, “nah” — is fortified by the reaction of the others present at the time. Amaro translated to the others that defendant answered the question “do you wish to talk with us?” by saying “perhaps with an attorney.” In context, as discussed more fully below, I do not find this to be ambiguous. I also find from the context that Amaro’s recasting of defendant’s answer *155 as “perhaps with an attorney” is consistent with “no, maybe with an attorney.” Moreover, the immediate response by Romboli, the more experienced interrogator in the room, was to stop the questioning of defendant. Amaro, the officer who was closest to defendant and best situated to hear his response, aiso asked for instructions about what should happen next.[10]
After Amaro had defendant sign a Spanish-language Miranda warning form, Gibson began further questioning defendant, asking whether defendant understood that he could talk with them without an attorney, asking whether he (defendant) wanted “to talk with us with an attorney, or without an attorney,” and making clear that defendant knew that he could speak with the police “without having an attorney” present. See Exhibit 6 at 11-13. Only after these questions and comments by Gibson did defendant say “Okay. Let’s talk.” Defendant’s resulting statement (“Okay. Let’s talk.”) appears to me on the video to be a resignation or a change of defendant’s mind from the decision he had made before when he initially said “No, maybe with an attorney.”
Thereafter, defendant gave a recorded statement, which he now seeks to suppress.
DISCUSSION
The Commonwealth bears the burden of proving from the totality of the circumstances that a defendant knowingly, voluntarily and intelligently waived his rights under Miranda before it may use the defendant’s custodial statements made in response to police questioning. Commonwealth v. Gaboriault, 439 Mass. 84, 89 (2003); Commonwealth v. Magee, 423 Mass. 381, 386-88 (1996); Commonwealth v. Edwards, 420 Mass. 666, 669-70 (1995).
While Miranda warnings need not take a particular form, see Commonwealth v. Bins, 465 Mass. 348, 358 (2013), a Miranda waiver will be considered valid only if the defendant is cognizant of the rights he forfeits and the risks that he incurs by speaking to the police. Commonwealth v. Edwards, 420 Mass. at 670.
If a person in custody invokes his right to remain silent or his right to speak with an attorney, “the police must immediately cease questioning him until an attorney is present,” Davis v. United States, 512 U.S. 452, 454 (1994); Edwards v. Arizona, 451 U.S. 477, 481 (1981), quoting Miranda v. Arizona, 384 U.S. 436, 474 (1966), provided his invocation is clear and unambiguous. Davis, 512 U.S. at 459; Commonwealth v. Contos, 435 Mass. 19, 29 (2001). The invocation of the right to remain silent or the right to counsel triggers the requirements of fresh Mirandawarnings. Commonwealth v. Silanskas, 433 Mass. 678, 687 (2001).
Here, defendant was asked a direct question: “Having these laws in mind, do you want to talk with us?” His answer, while shaking his said head ever so slightly, was “No, maybe with an attorney.” There was nothing ambiguous in his response.[11] See, e.g., Commonwealth v. Clarke, 461 Mass. 336, 343 (2012). Even if defendant had not included the “no” or “nah” in his response, but in response to the direct question had only responded “maybe with an attorney,” it would have still been sufficient to invoke his right to remain silent and his right to counsel. See, e.g., Commonwealth v. Hoyt, 461 Mass. 143, 150-51 (2011). Romboli halted further questioning. A reasonable police officer in the position of the officers here, including Amaro, would have understood defendant’s statement as a decision not to talk to the police, but perhaps to talk to them "with counsel present.
Defendant was not merely “musing out loud or wondering if he should speak to [an attorney.]” Commonwealth v. Santos, 463 Mass. 273, 285 (2012). See, e.g., Commonwealth v. Morganti, 455 Mass. 388, 397-98 (2009) (statement that defendant was “thinking I might need a lawyer and want to talk with him before talking to you” did not unambiguously invoke right to counsel) (and cases cited). Rather, defendant’s response was sufficiently clear that he did not wish to speak to interrogators without an attorney present. Massachusetts courts have found unambiguous other statements made with even less clarity. See, e.g., Contos, 435 Mass. at 29 (“I think I’m going to get a lawyer”).
The Commonwealth cites me to Commonwealth v. Santos in support of its argument that defendant’s statement was ambiguous. There, in response to police questioning about a vehicle involved in a murder, the defendant stated: “You ask Lou that. I’m not going on with this conversation. I want a lawyer, because you keep — ask Lou that.” Santos, 463 Mass. at 282. The Court found this invocation unambiguous because defendant was not “musing” or “wondering” about speaking to an attorney, the statement was not conditioned on police intent regarding his arrest, and the Assistant District Attorney watching the interrogation thought the statement was an invocation and asked officers to cease questioning. Id. at 285-86. The Court, however, still found that defendant’s subsequent statements were admissible because “following the defendant’s initial Miranda waiver, his invocation of the right to counsel was unambiguous, but he then appeared immediately and without police interruption to qualify the request, and to indicate that he only wanted an attorney if the officers continued questioning about the car.” Id. at 286. In these circumstances, “a reasonable interrogating officer could have been uncertain whether the defendant had invoked his Miranda rights.” Id. Here, defendant did not qualify his need for an attorney based on his unwillingness to answer questions on a “particular topic,” id., at 285, nor did he continue speaking without police interruption. Accordingly, the reasoning in Santos does not apply here.
The Commonwealth likewise relies on Commonwealth v. DuBois, 451 Mass. 20 (2008). There, defen *156 dant stated during questioning, ‘This sound serious. Maybe I better get a lawyer.” DuBois, 451 Mass. at 25. The police then asked defendant if he wanted a lawyer, but defendant did not respond. In holding that defendant did not unambiguously invoke his right to counsel, the Court relied upon the motion judge’s finding that, “because the defendant used the word ‘maybe’ in his first reference to a lawyer, he was not invoking his right to counsel.” The Court further reasoned that defendant’s short-lived silence in response to a direct question was insufficient to qualify as an expressed unwillingness to continue questioning. Id. Dubois, however, is inapplicable here. Although defendant used the word “maybe” or “perhaps” (depending on the translation) in response to a direct question from police, his statement is best understood as “maybe I will talk to you when I have an attorney,” not “maybe I should get an attorney.” The latter may properly be considered an ambiguous musing; the former is not. See, e.g., Morganti, 455 Mass. at 397-98, Commonwealth v. Todd, 408 Mass. 724, 726 (1990) (no affirmative request for counsel where defendant “wondered aloud about the advisability of having a lawyer”); Commonwealth v. Corrtveau, 396 Mass. 319, 331 (1985) (no affirmative request for counsel where defendant stated, “It’s beginning to sound like I need a lawyer”); Commonwealth v. Pennellatore, 392 Mass. 382, 387 (1984) (defendant’s comment, “I guess I’ll have to have a lawyer for this” acknowledges seriousness of charges rather than affirmative request for attorney).
Notably, it was not Romboli, but the less experienced detective, who began the further discussion with defendant about his right to speak to the police without counsel present. Gibson attempted to make clear that defendant could speak to the police without counsel present. He did not meaningfully attempt to clarify whether defendant accurately understood his right to have counsel appointed before questioning or whether he wished to consult with counsel. Even if defendant’s response to Amaro’s question was ambiguous, the Fifth and Sixth Amendments constrain the nature of the clarifying questions which the police may ask. As the Supreme Judicial Court has recently described:
In such circumstances, an interrogating officer must cease the interrogation, but is entitled to ask a question to clarify the defendant’s intent. The question — for example, in a form such as, “I just want to be sure — do you want an attorney?”— should be brief, worded only to elicit an affirmative or negative response concerning whether the suspect wants an attorney, and should not be designed to keep the suspect talking. After such an inquiry to clarify whether a suspect has indeed requested an attorney, nothing further should be asked unless the suspect responds to the question in the negative.
Santos, 463 Mass. at 286. See also Commonwealth v. Hearns, 467 Mass. 707, 718 (2014).
Even if the police thought defendant’s response was unclear, Gibson’s comments and questions did nothing to clarify the ambiguity. See, e.g., Commonwealth v. Hoyt, 461 Mass. at 154 (defendant’s demonstrated misunderstanding about the right to counsel “was exacerbated by what might have been an effort on the part of the police to clarify the defendant’s statements”). To the contrary, Gibson’s comments and questions only served to suggest that defendant could speak with the police without counsel present, a legal principle beneficial to the police but in no way protective of defendant’s constitutional rights. The Miranda rights are designed to safeguard a defendant’s rights under the Fifth and Sixth Amendments to the United States Constitution. To clarify that a defendant has the right to speak with the police without counsel present (i.e. to incriminate himself and to do so without counsel) substantially undermines and dilutes the rights Miranda is designed to protect. Had Gibson truly wanted to “clarify” defendant’s response, he could have had Amaro review the Miranda warnings again with defendant in Spanish or could have explained to defendant the fact that counsel could have been available to him immediately, or during or before questioning. Where, as here, “the officers did not correct the defendant’s manifest misunderstanding of his right to appointed counsel, and as a result the Commonwealth cannot prove beyond a reasonable doubt the defendant waived his Miranda rights knowingly, voluntarily, and intelligently,” his statements must be suppressed. Commonwealth v. Hoyt, 461 Mass. at 154.
ORDER
Defendant’s Motion to Suppress (Docket #16) is ALLOWED.

Exhibits 7 and 8 are computer discs, which were represented at the hearing to contain the audio portion of the recorded interview with defendant and the audiovisual version of the same interview, respectively. With the assistance of counsel after the hearing solely to operate the equipment necessary to replay Exhibits 7 and 8,1 watched and listened to the relevant portions of the two exhibits. Exhibit 7 contains the same audiovisual recording of the interview that is contained on Exhibit 8.

While it does not figure into my decision, defense counsel represented at the hearing that defendant is also largely illiterate in Spanish. There was no evidence at the hearing on this point.

Witnesses were also uncertain whether the booking videotape would include an audio recording, or only a visual (silent) recording of the booking process.

Gibson had been with the Revere Police Department fewer than nine years and had been a detective for only about two years at the time. He was only newly coming to conduct sexual assault interrogations. In contrast, as of February 13, 2013, Romboli had been with the Revere Police Department for approximately 18 years and had been a detective since 2008. She had conducted a number of sexual assault interrogations.

Amaro was not called as a witness by either party. He has since resigned from the Revere Police Department due to an unrelated incident, as a result of which he had been placed on administrative leave for violating department policies regarding criminal conduct and conduct unbecoming an officer. See Commonwealth’s Notice of Discovery dated April 22,2014 (“Docket #25”).

The police did not expressly obtain defendant’s approval for the recording.

For example, Romboli stated and Amaro translated: “You are in the Revere Police station”; “You are under arrest under a warrant”; and “We have already processed you with a warrant.” See Exhibit 6 at 6 and the corresponding portions of Exhibit 8.

Sphere is no evidence to suggest that Gibson or Romboli knew that Amaro had inaccurately translated the Miranda warnings.

Although I would ordinarily insert “[sic]” into such a quote to reflect the accuracy of my rendition of an awkward or inaccurate word or phrase, because of the number of times I would have to put that notation into this quote, it suffices to state here that I have double checked the accuracy of the quotation against page 9 of Exhibit 6, which I credit based on O’Laughlin’s testimony, and that it is an accurate reproduction of the English translation of the Spanish spoken by Amaro.

The parties dispute whether Amaro said “what happens now,” as O’Laughlin transcribed, or “do you still want him to sign this,” as the Commonwealth contends. Either way, Amaro immediately asks for guidance from the more experienced detectives, apparently in light of his understanding of defendant’s negative answer to his question and Romboli’s directive to stop the questioning. As described below, the Commonwealth bears the burden to show that defendant’s waiver of Miranda was knowing and voluntary. Regrettably, the Commonwealth chose not to call Amaro as a witness, although he was the only person to have heard live and understood defendant’s answer in Spanish.

The question of whether a defendant has invoked his right to remain silent or has requested counsel depends on the words spoken by the defendant. A mistranslation by an interpreter cannot be held against the defendant and cannot serve to interject an ambiguity in the defendant’s invocation where none exists in the defendant’s actual words.