## Commonwealth vs. Robert J. Morganti, Jr.

Plymouth. September 11, 2009. - November 25, 2009.

Present: Marshall, C.J., Ireland, Spina, Botsford, & Gants, JJ.

*Homicide. Constitutional Law,* Admissions and confessions, Assistance of counsel, Waiver of constitutional rights, Voluntariness of statement, Delay in commencement of prosecution, Self-incrimination, Standing to question constitutionality. *Due Process of Law,* Assistance of counsel, Delay in commencement of prosecution. *Evidence,* Admissions and confessions, Voluntariness of statement, Jury view, Demonstration. *Practice, Criminal,* Capital case, Admissions and confessions, Assistance of counsel, Waiver, Voluntariness of statement, Arraignment, Delay in commencement of prosecution, Jury and jurors, View, Presence of defendant, Standing, Argument by prosecutor, Instructions to jury. *Extradition and Rendition. View. Witness,* Self-incrimination.

A Superior Court judge properly denied the criminal defendant's pretrial motion to suppress statements he made to police, where the defendant's statement that he was "thinking [he] might need a lawyer" reflected his musing about the possibility of stopping the questioning until he had spoken to an attorney, which was too ambiguous to constitute an unequivocal invocation of the right to counsel [396-398]; where the "safe harbor" rule established in *Commonwealth* v. *Rosario,* 422 Mass. 48, 56-57 (1996), which states that a statement made by a defendant more than six hours after his arrest must not be admitted in evidence unless the defendant waives his right to a prompt arraignment, did not apply, in that the defendant was arrested in California and his arraignment had to await his rendition to Massachusetts, and was not violated in spirit, given that the Massachusetts police officer required time to fly to California to interrogate the defendant [398-400]; and where, with regard to the recording of statements the defendant made while alone in the interview room and speaking on the telephone, the defendant had been placed on notice that the police intended to record what was said in the interview room (even if he did not know whether the police were actually recording), and further, even if the admission in evidence of the recording were error, such error was harmless, given that the defendant repeated the only incriminating statement after a police officer had returned to the room [400-401].

At a criminal trial, the judge did not abuse her discretion in excluding the defendant from a jury view of an automobile, where the defendant had no right to be present, where the evidence supported the judge's findings regarding the security risks that allowing the defendant to be present posed, and where the judge was willing to make alternate arrangements to accommodate the defendant. [401-403]

A criminal defendant lacked standing to challenge a Superior Court judge's rulings that a witness had no valid privilege against self-incrimination and

that the witness could not confer with counsel after he had taken the witness stand. [403-404]

At a criminal trial, the evidence showed that the prosecutor, in closing argument, did not err in saying that a witness had "probably" made a certain statement to police; that the witness was being evasive when he spoke with police and when he testified, because the defendant had been the witness's friend; and that the victim's mother saw her son being chased by two people; further, the evidence permitted the prosecutor to argue that the jury could infer that the victim and the two people chasing him were running in the direction of a particular vehicle, as well as infer that a certain witness telephoned police. [404-407]

At a murder trial, the judge did not err in instructing the jury regarding the factors set forth in *Commonwealth* v. *Cunneen*, 398 Mass. 216, 227 (1989). [407]

INDICTMENT found and returned in the Superior Court Department on May 29, 1998.

A pretrial motion to suppress evidence was heard by *Linda E. Giles,* J., and the case was tried before her.

*Donald A. Harwood* for the defendant.

*Mary E. Lee,* Assistant District Attorney, for the Commonwealth.

GANTS, J. On June 13, 2003, a jury convicted the defendant of murder in the first degree, based on both deliberate premeditation and extreme atrocity or cruelty. Represented by new counsel on appeal, the defendant argues that the trial judge erred in (1) admitting in evidence statements, some of which were electronically recorded, made by the defendant more than six hours after his arrest in California on unrelated charges and after he had purportedly invoked his constitutional right to silence; (2) permitting the defendant to be excluded from a jury view; (3) preventing a witness from consulting with his attorney as to his right against self-incrimination; and (4) failing to instruct the jury, in explaining the element of extreme atrocity or cruelty, that they must be unanimous in finding at least one of the factors set forth in *Commonwealth* v. *Cunneen,* 389 Mass. 216, 227 (1983). The defendant also contends that the prosecutor's closing argument was improper in several respects and not supported by the evidence at trial. We affirm the defendant's conviction and see no basis to grant relief under G. L. c. 278, § 33E.

*The evidence at trial.* The Commonwealth alleged that, late on the evening of May 10, 1988, the defendant, angry at having been "ripped off" in a drug deal, shot Anthony LoConte (victim)

in the head at close range, killing him. The jury could have found the following facts from the evidence at trial. In the spring of 1988, the defendant was a mid-level distributor of cocaine in Brockton. Jeffrey Tessier worked as a "runner" for the defendant, helping him to break up large amounts of cocaine into smaller quantities and then distributing the repackaged drugs.

On May 10, 1988, the defendant told Tessier he was "dry" and knew of no source from which he could purchase cocaine. Tessier unsuccessfully tried to connect the defendant with a cocaine supplier, and then devised a scheme in which he would trick the defendant into paying him for what the defendant would mistakenly believe was one-quarter kilogram of cocaine. In the course of carrying out the ruse, Tessier traveled with the defendant in a vehicle (a Monte Carlo) driven by Brian Madden to the victim's home. Tessier entered the victim's home alone, spoke with the victim, gathered various items, including "an Old Spice" container, and placed the hastily assembled package in a brown paper bag. Tessier then returned to the Monte Carlo with the paper bag; the defendant gave Tessier $10,500 in cash, and Tessier handed the defendant the package, which supposedly contained the cocaine. The defendant drove off, and Tessier returned to the victim's home and gave the victim $2,000. The defendant was not fooled for long by Tessier's primitive ruse. Five minutes later, the defendant and Madden returned to the victim's home. Banging loudly on the back door, the defendant angrily demanded the return of his money. The victim raced out the front door.

At approximately 11 P.M. that night, Michael Geiler, a resident of Howard Street in Brockton, saw a vehicle with its interior lights on slow down in front of his home and come to a complete stop. After the vehicle left, he observed what looked like a trash bag on the side of the road. When Geiler heard a motorist scream for help, he saw that what he had initially thought was a trash bag was in fact the victim lying on the ground, still breathing and moaning. Emergency medical technicians were summoned; when they arrived, the victim was unconscious, with a pulse, but he did not survive. The autopsy conducted on May 11, 1988, revealed that the cause of the victim's death was a gunshot wound to his head. The medical examiner determined that a single bullet had entered the victim's skull behind his left ear, traveled through

the right frontal lobe of his brain, and exited over his right eye. At its point of entry, the bullet hole was three-eighths inch in diameter, consistent with a bullet fired from a .380 caliber firearm. The medical examiner who conducted the autopsy opined that the firearm had been fired less than six inches from the victim's head, because the wound was round and there were burns around the edges of the wound.

Sometime around midnight, while sirens could still be heard in the background, the defendant telephoned his friend, Travis Merritt, and told him that he had gotten ripped off, that something had gone wrong, and that he had shot somebody. The defendant later arrived at Merritt's apartment with blood on his chin and clothing. He repeated that he had shot somebody, but said he did not know whom he had shot. He said he had thrown his gun out of a vehicle while driving on or near Harrison Boulevard.[1] The defendant also told Merritt that he wanted to look for Tessier because Tessier had taken his money.

On the morning of May 11, 1988, the defendant went with Merritt to Gary Gamel's home and told him, "I just want my money. I killed the wrong person." While the defendant was inside Gamel's home, Tessier arrived outside. The defendant wanted to go outside and get his money back, but Gamel said that he would take care of it. Moments later, Gamel returned with about $7,500. The defendant counted the money and said he was short. The defendant then handed each person present a one hundred dollar bill, including Gamel. Merritt, another person, and the defendant then took a taxicab, which dropped the defendant off near the residence of Joseph Valente, a former business associate of the defendant. The defendant told Valente that he had gotten ripped off and that he needed to get in touch with an individual who had recently arrived from California.

Merritt did not see the defendant again until trial. A few weeks after the murder, the defendant called Merritt and said "that he couldn't believe he could never come back."

After midnight on the night of the killing, Brian Madden (the driver of the Monte Carlo) telephoned his brother Mark, and

---

[1]Merritt had seen the defendant in possession of a .380 caliber handgun one or two days before the shooting. Tessier had seen the defendant with a .380 caliber firearm on the day of the shooting. The police did not locate the firearm used in the shooting.

shortly thereafter, Mark went to Brian's house. When Mark arrived, he saw blood inside Brian's Monte Carlo. After receiving a telephone report of an emergency, the police were dispatched to Brian's house; officers arrived at 12:39 A.M. Police discovered a great deal of blood on the front passenger seat of the Monte Carlo, as well as a compact disc and Old Spice container. The deoxyribonucleic acid (DNA) profile of the blood found on the floor mats in the Monte Carlo was later shown to match the DNA profile of the victim.[2] Inside the kitchen of Brian Madden's home, the officer saw compact discs with blood on them.

Kenneth F. Martin, a State police detective lieutenant and an expert on blood stain pattern analysis, after having examined the blood evidence and conferring with the medical examiner as to the autopsy results, opined that the shooter had been sitting in the rear seat of the Monte Carlo, behind the driver, when he shot the victim in the front passenger seat in the head. Lieutenant Martin concluded that it would be difficult to have fired a shot from the driver's seat at the angle indicated by the entrance and exit wounds, and he ruled out the possibility that the shooter fired from directly behind the victim in the back seat.

A homicide warrant issued against the defendant on May 11, 1988, but for the next twelve years he remained a fugitive. On March 16, 2000, the defendant was arrested in California for operating a motor vehicle while under the influence of alcohol. At the time of the arrest, he was carrying a driver's license in the name of Roderick Grinage. Later that day, after the defendant had been released on bond, Lieutenant Bryan Markum of the Stanislaus County, California, sheriff's department visited "Grinage" at his home and inspected the residence. He found identifications in three names, and "Grinage" admitted to two other aliases. Lieutenant Markum did a warrant check using the aliases and learned of the Massachusetts fugitive warrant against the defendant. He advised the Massachusetts authorities, who sent him a facsimile of the defendant's fingerprint card; the defendant's fingerprints were positively identified as the fingerprints of "Grinage."

---

[2] Two latent fingerprints were found on the Monte Carlo, one on the passenger door and another on the passenger door window. The fingerprint on the passenger door matched the victim's fingerprints; the other fingerprint did not match either the victim's or the defendant's fingerprints.

Sergeant Leonard G. Coppenrath of the Massachusetts State police learned on March 17, 2000, that the defendant had been apprehended, and he departed the next day for California. When he arrived, he met with the defendant, who was then in custody, and advised him of his Miranda rights from a Miranda form. During this initial interview, the defendant continued to call himself Grinage and insisted he was from New York. Sergeant Coppenrath finally wrote the defendant's true name in the blank space left for the name on the Miranda form. Recognizing that his true identity had been discovered, the defendant asked, "Now what?" and inquired whether his girl friend in California had "rat[ted] [him] out."

The defendant then asked whether he and Sergeant Coppenrath could speak where the air conditioning was not so strong and where he could get something to eat. They drove a few miles to a local sheriff's office and continued the interview in a room that contained videotape recording equipment. At one point, Sergeant Coppenrath interrupted the interview to allow the defendant to telephone the mother of his son; the conversation was recorded on videotape. During this telephone call, the defendant told his son's mother that she should explain to their son that "Daddy did a bad thing."

*The factual findings from the motion to suppress hearing.* The defendant claims that the judge erred in denying his motion to suppress the statements he made to Sergeant Coppenrath.[3] "In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of [her] ultimate findings and conclusions of law.' " *Commonwealth* v. *Scott,* 440 Mass. 642, 646 (2004), quoting *Commonwealth* v. *Jimenez,* 438 Mass. 213, 218 (2002). With one exception, which we will discuss, we find no clear error in any of the judge's relevant findings of fact. We summarize those findings, based on the evidence presented at the motion hearing, supplemented when needed by undisputed facts in the motion record.

On March 18, 2000, Sergeant Coppenrath met with the defendant alone in an interview room of the Stanislaus County jail in

---

[3]The judge orally ruled on the motion to suppress on the first day of trial before jury selection commenced.

Modesto, California. At the time of the interview, the defendant was in custody on unrelated charges in California, and did not yet have an attorney. Sergeant Coppenrath, using a preprinted form, advised the defendant of his Miranda rights. The defendant said that he understood his rights but he would not sign the form. Sergeant Coppenrath revealed to the defendant that he knew his true identity, and that the defendant would be returning to Massachusetts to stand trial for the victim's murder. The defendant did not initially respond when Sergeant Coppenrath asked whether he wanted to speak about the murder, and did not refer specifically to the incident, characterizing the time period only as "when I left." The defendant told Sergeant Coppenrath that he had not seen or spoken to his family since leaving Brockton. He admitted to knowing several of the people associated with the case, including Gamel and Tessier.

When Sergeant Coppenrath proposed that the defendant's part in the murder might best be told by him, the defendant stated that he had not admitted to killing anyone yet. Sergeant Coppenrath suggested various scenarios that may have explained the defendant's involvement in the murder, but the suggested scenarios did not elicit any confirmation or denial from the defendant. After Sergeant Coppenrath showed him a photograph of the Monte Carlo in which the victim had been killed, the defendant said simply, "It looks like a green Monte Carlo." The defendant then stated that he was "thinking I might need a lawyer and want to talk with him before talking to you." He immediately then stated that it would be easier to discuss the charges if he were in a more comfortable room (because the air conditioning made the interview room uncomfortably cold), and if he could have something to eat.

As a result of the defendant's request, Sergeant Coppenrath and the defendant, accompanied by Lieutenant Markum and another sheriff's detective, traveled to the Stanislaus County sheriff's department, which was four to five miles from the jail, and entered a room that contained videotape recording equipment and two sofas. The defendant and Sergeant Coppenrath remained in the room; the two sheriff's detectives left. The judge found that the defendant was told that the videotape equipment would be recording during the course of the interview. This was the lone error in the judge's findings of fact; the motion record does not

support a finding that the defendant was told that the videotape equipment was recording at the onset of the interview. Rather, the record supports a finding that the defendant was informed before any substantive questioning that the police *intended* to videotape the interview; however, the defendant did not learn until later in the interview that the videotape equipment was actually recording.[4]

During the videotaped interview, Sergeant Coppenrath learned from the defendant that it was his son's birthday. The sergeant then invited the defendant to telephone his son to wish him a happy birthday. The defendant provided the sergeant with the telephone number of his son's mother, and the sergeant dialed the telephone number, handed the telephone to the defendant, and left the interview room. The videotape equipment continued to run and recorded what the defendant said to his son's mother, but not what she said to him.

In this conversation, the defendant told her that "they" had found that his true name was Robert Morganti, and that he had a murder charge against him from "back East." He instructed her that if anyone should come knocking at her door, not to speak

---

[4]Lieutenant Markum testified that the videotape camera was clearly visible on the wall directly in front of the couch on which the defendant was sitting, between ten and fifteen feet away, and was pointed out toward the defendant, but he recalled no conversation in the presence of the defendant about recording or videotaping the interview. Nor did he turn on the videotape recording equipment in the interview room; he started the videotape from the nearby videotape recording room once he figured out how it functioned, which took him between two and five minutes.

In his report, which was admitted in evidence at the motion hearing, Sergeant Coppenrath wrote that the defendant "was told that there was audio and video which would be available to record his statement," but that he and the defendant did not learn that the interview was being recorded until several minutes after its start. While the interview was being recorded, Sergeant Coppenrath told the defendant: "Here's what will happen if you want to talk. You're on tape — audio or video. Go through your rights; you'll explain in your words. I'll ask some questions." Sergeant Coppenrath, however, did not initially know whether the sheriff's detectives had actually recorded the interview. Midway through the interview, he told the defendant, "I don't know if those tapes are on or not," and asked the defendant if it mattered to him. The defendant shook his head "no." Only later, toward the end of the interview, after the defendant had spoken with his son's mother, did Sergeant Coppenrath and the defendant learn that the videotape equipment had indeed been recording the interview when the sergeant asked the detectives in the defendant's presence if the recorder was "on," and was told that it was.

with them; instead, she was to tell them that she wished to speak to an attorney. The defendant told her to tell their son that he "did a bad thing a long time ago." After Sergeant Coppenrath returned to the room, the defendant continued the conversation with his son's mother. In Sergeant Coppenrath's presence, he told her, "[I]f you want to tell him something, just say, 'Hey, daddy did a bad thing' . . . ."

After the two had eaten the meal that had been delivered to them, Sergeant Coppenrath asked the defendant if he wanted to tell him about "May 11th," referring to the victim's murder. The sergeant added that, if the defendant did not want to talk about it, he did not have to talk about it, but that he (the sergeant) was obligated to ask him. The defendant responded, "To tell you the truth — I think I would rather take my chances on a lawyer . . . ." Although the interview continued, the Commonwealth agreed that none of the defendant's statements after this point in the interview would be offered in evidence at trial. The judge ruled that, until this point, the defendant had voluntarily, knowingly, and intelligently waived his Miranda rights, including his right to silence and to confer with counsel. The judge further ordered that the defendant's invocation of his right to silence and to counsel be redacted from the tape recording heard by the jury.

*Discussion.* We address each of the defendant's claims of error in turn.

1. *Motion to suppress.* The defendant argues that the judge erred for three separate reasons in denying the motion.[5]

a. First, the defendant contends that Sergeant Coppenrath was required to terminate his interrogation of the defendant after the defendant, while still at the jail, said that he was "thinking I might need a lawyer and want to talk with him before talking to you."

When an accused has invoked his right to counsel during a custodial interrogation, the police must stop the interrogation until counsel has been made available to the defendant, unless the accused himself initiates further conversation with the police. See *Edwards* v. *Arizona,* 451 U.S. 477, 484-485 (1981). To invoke the right to counsel, "the suspect must unambiguously request

---

[5]The defendant does not challenge on appeal the voluntariness of the statements he made to Sergeant Coppenrath.

counsel." *Davis* v. *United States*, 512 U.S. 452, 459 (1994). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," the police questioning need not cease. *Id.* See *Commonwealth* v. *Judge*, 420 Mass. 433, 450 (1995). See also *Commonwealth* v. *Obershaw*, 435 Mass. 794, 800 (2002), and cases cited ("We have repeatedly held that equivocal statements and musings concerning the need for an attorney do not constitute such an affirmative request"). Rather, to invoke his right to counsel, the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis* v. *United States*, *supra*. We conclude that the evidence supports the judge's conclusion that the defendant's statement at the jail, quoted above, was ambiguous and equivocal, and would not reasonably be understood in the circumstances to constitute an invocation of the right to counsel.

The defendant contends that his statement to the police was comparable to the statement in *Commonwealth* v. *Contos*, 435 Mass. 19 (2001), which we found to be an unambiguous invocation of the defendant's right to counsel. See *id.* at 29. There, the defendant, after one and one-half hours of interrogation, said to the police, "I think at this point we need to stop." *Id.* at 28. When the officer asked why, the defendant replied, "I think we're going to stop, and I think I'm going to get a lawyer. If this is the way this is going, you're either accusing me or charging me." Here, by contrast, the defendant did not declare that the interrogation needed to stop, or that he and Sergeant Coppenrath were "going to stop." He did not declare his intent to "get a lawyer." Nor did the defendant suddenly recognize, from the "way [the questioning] was going," that the police were going to accuse him of a crime or charge him with a crime; Sergeant Coppenrath had told the defendant early in the interview that he had been charged with the victim's murder and would be brought to Massachusetts for trial.

Instead, the defendant said only that he was "thinking I might need a lawyer and want to talk with him before talking to you," which a police officer reasonably would understand as the defendant's thinking out loud that he *might* need a lawyer and *might*

want to stop the questioning until he spoke to the lawyer. When a suspect's statement, as here, simply reflects his musing about the possibility of stopping the questioning until he has spoken with an attorney, we have consistently found the statement to be too ambiguous to constitute an unequivocal invocation of the right to counsel. See, e.g., *Commonwealth* v. *Dubois*, 451 Mass. 20, 25 (2008) ("This sounds serious. Maybe I better get a lawyer"); *Commonwealth* v. *Jones*, 439 Mass. 249, 258 (2003) (defendant stated that he was "going to need a lawyer sometime"); *Commonwealth* v. *Peixoto*, 430 Mass. 654, 657-658 (2000) (defendant expressed uncertainty as to whether he wanted to speak to police without attorney); *Commonwealth* v. *Todd*, 408 Mass. 724, 726 (1990) (defendant "wondered aloud about the advisability of having a lawyer"); *Commonwealth* v. *Corriveau*, 396 Mass. 319, 331 (1985) ("It's beginning to sound like I need a lawyer"). See also *Commonwealth* v. *Hussey (No. 1)*, 410 Mass. 664, 671, cert. denied, 502 U.S. 988 (1991) (defendant's statement that "he had nothing else he could say," coupled with his "thinking out loud" about whether he should talk or "shut . . . up," did not amount to invocation of right to cut off questioning).

Likewise, the defendant did not do or say anything immediately after he made this ambiguous statement that reasonably should have caused a police officer to understand that the defendant was unequivocally invoking his right to counsel. To the contrary, the defendant said that it would be easier to speak of the charges if he were in a more comfortable room and was provided something to eat. Neither of these requests would suggest that the defendant had just expressed his refusal to speak further before conferring with counsel.[6]

b. Second, the defendant claims that his statements must be

---

[6]Sergeant Coppenrath testified at the motion hearing that, after the defendant said he was thinking that he might need a lawyer, "He would be asked, . . . 'Do you want one?' " On cross-examination, however, the sergeant admitted that he did not actually ask the defendant any questions as to whether he wanted to speak to an attorney that would have resolved the ambiguity, but instead went on to discuss how cold it was in the room. The judge made no findings as to whether the sergeant sought clarification from the defendant as to whether he wanted to confer with counsel. The United States Supreme Court has declared that, when there is ambiguity as to whether the defendant has invoked his right to counsel, it is generally "good police practice" for the

suppressed because they were made more than six hours after his arrest, in violation of the safe harbor rule we established in *Commonwealth* v. *Rosario*, 422 Mass. 48, 56-57 (1996). This rule provides that, in the absence of exceptional circumstances, a statement made by a defendant more than six hours after his arrest shall not be admitted in evidence unless the defendant waives his right to a prompt arraignment.[7] In establishing this safe harbor rule, we recognized that the police have a duty to bring an arrested person before a court for arraignment as soon as reasonably possible to prevent unlawful detention "and to eliminate the opportunity and incentive for application of improper police pressure." *Id.* at 51. See Mass. R. Crim. P. 7 (a) (1), as appearing in 442 Mass. 1506 (2004) ("A defendant who has been arrested shall be brought before a court if then in session, and if not, at its next session"). We also have recognized that police officers know that, when arraigned, the defendant would have a right to counsel, so police officers may seek to delay an uncounselled defendant's arraignment in order to continue an interrogation. *Commonwealth* v. *Rosario*, *supra* at 53. Cognizant that different trial judges had differing views as to what constituted unreasonable delay in arraignment, we have determined that, to avoid uncertainty and the uneven application of the reasonableness standard, we would establish "as clear a rule as possible concerning both the right of the police to question an arrested person and the standard for suppressing statements made by a defendant after arrest and before arraignment." *Id.* at 53.

The safe harbor rule established in the *Rosario* decision applies by its terms only to persons arrested in Massachusetts who could be arraigned in Massachusetts; it was not intended to apply to persons arrested in other States on warrants issued in Massachusetts, whose arraignment would need to await their rendition to Massachusetts. The danger that triggered the need for the rule — that police officers would delay a defendant's arraignment in

interviewing officer to seek clarification from the suspect as to whether he wishes to speak to an attorney, but it has declined to adopt a rule requiring such clarifying questions. *Davis* v. *United States*, 512 U.S. 452, 461 (1994). We, too, agree that it is good police practice to ask clarifying questions. See *Commonwealth* v. *Obershaw*, 435 Mass. 794, 801 (2002).

[7]Sergeant Coppenrath advised the defendant of his right to a prompt arraignment, but the Commonwealth does not contend that the defendant waived his right.

order to procure a confession from an unrepresented defendant — does not arise when the defendant must await a rendition hearing before being transported to Massachusetts for arraignment.

While the letter of the safe harbor rule does not apply to defendants arrested outside Massachusetts, we consider whether the circumstances of this interrogation violated the spirit of the rule. It did not. Here, the Massachusetts State police could not interrogate the defendant during the six-hour period following his arrest, because a State trooper needed to fly from Massachusetts to Modesto, California, to conduct the interrogation. The motion hearing record reflects that Sergeant Coppenrath learned of the defendant's true identity on March 17, 2000, left the next day for California, and interviewed the defendant later that day. The interrogation of the defendant by Sergeant Coppenrath did not exceed six hours, even when one includes travel time from the jail to the sheriff's department office. Therefore, we conclude that neither the letter nor the spirit of the *Rosario* safe harbor rule was violated by this interrogation.

c. Third, the defendant argues that the recorded statements that the defendant made to his son's mother on the telephone while Sergeant Coppenrath was not in the room must be suppressed because the defendant did not consent to the recording of this conversation. We earlier concluded, *supra* at 395, that the record supports the judge's finding that the defendant was informed before he made this telephone call that the police *intended* to videotape the interview, even if it does not support her finding that the defendant knew before he made this call that the videotape recording equipment was actually running. Therefore, when the defendant telephoned his son's mother, the defendant had been placed on notice that the police intended to record what was said in the interview room; he simply did not know whether they actually were recording.

Under Federal law, California law, and Massachusetts law, the oral interception of the defendant's statements during this telephone call was not illegal if he knew of, or consented to, the interception. See 18 U.S.C. § 2511(2)(d) (2006) (Federal wiretap statute does not prohibit recording of oral communications "where one of the parties to the communication has given prior consent to such interception"); *United States* v. *Novak*, 531 F.3d 99, 101-102 (1st Cir. 2008); Cal. Penal Code § 632(c) (West

1999) (California wiretap statute does not prohibit recording of oral communications where "parties to the communication may reasonably expect that the communication may be overheard or recorded"); G. L. c. 272, § 99 B 4 & C 1 (Massachusetts wiretap statute prohibits wilful interception of oral communication, but "interception" means to "secretly record"); *Commonwealth v. Jackson*, 370 Mass. 502, 505 & n.4 (1976) (only "secret" interceptions without prior authority are illegal under G. L. c. 272, § 99). See also *Griggs-Ryan* v. *Smith*, 904 F.2d 112, 116 (1st Cir. 1990) ("we — and other courts — have held that [Federal law] affords safe harbor not only for persons who intercept calls with the explicit consent of a conversant but also for those who do so after receiving implied consent"). Because the defendant knew that his words in the interview room were subject to being recorded, the actual interception of his words was not unlawful.[8] Indeed, where the intercepted party is in custody and is informed that his oral communications are subject to electronic monitoring, the recording of those communications is not an "interception" under the Massachusetts wiretap statute. *Commonwealth* v. *Boyarsky*, 452 Mass. 700, 706 (2008). See *Commonwealth* v. *Jackson, supra* at 507 (recording not secret where intercepted party has actual knowledge of recording).

Moreover, even if it were error to have allowed in evidence the recording of the defendant's statements to his son's mother on the telephone when Sergeant Coppenrath was not in the room, the error would be harmless. The only materially incriminating statement the defendant made to his son's mother while Sergeant Coppenrath was not in the room was that she should tell their son that his father "did a bad thing a long time ago." The defendant gave her essentially the same advice moments later, when Sergeant Coppenrath had returned to the room and was listening to the defendant's side of the conversation.

The judge committed no error in allowing the defendant's statements in evidence.

2. *The defendant's exclusion from the view.* The defendant

---

[8]Because Federal, California, and Massachusetts law each permits the recording of conversations with the consent of the party intercepted, we need not address whether Massachusetts law would apply to an interception that took place in California.

contends that the judge erred in preventing him from being present at the jury view. We conclude that there was no error.

Through a motion in limine, the Commonwealth sought a pretrial ruling as to whether the jury could view a Monte Carlo automobile that was the same model, make, and year as the one in which the victim was killed, with a mannequin seated in the front passenger seat which had a yellow rod through the mannequin's head to mark the path of travel of the bullet that killed the victim. The Commonwealth contended that the view would assist the jury in understanding the expert testimony of Lieutenant Martin, who offered the opinion, based on the blood stain pattern analysis and the autopsy results, that the victim was sitting in the front passenger seat when he was shot by a person sitting in the rear seat behind the driver. The judge allowed the Commonwealth's motion after obtaining the Commonwealth's representation that no testimony would be taken during the view. The view was conducted prior to the opening statements, after the jury were instructed by the judge that the purpose of the view was to help them understand the evidence at trial. Each attorney was permitted at the view to draw the jury's attention to aspects of the view, but no evidence was taken and no demonstration performed.

The judge ruled that the defendant had no right to be present for the view and would not be permitted to attend. The defendant timely objected. In making her ruling, the judge found that the defendant posed a risk of flight, as he had been a fugitive from the pending charges for twelve years; the judge stated that she was "very concerned about security issues." She offered to allow the defendant to observe the view from a court house window, as the Monte Carlo was in a parking lot within sight of the court house, but the defendant declined her offer. She also offered the defendant the opportunity to conduct his own private viewing before the jury view in the presence of the judge, counsel, and the court reporter, but the defendant declined this offer as well. The defendant reviewed photographs of the view, however, including at least one photograph of the vehicle with the mannequin placed within and the rod protruding through its head, which was admitted in evidence at trial.

"We have held repeatedly that a defendant does not have a right to be present during a jury view" under either the Sixth or

the Fourteenth Amendment to the United States Constitution or art. 12 of the Massachusetts Declaration of Rights. *Commonwealth* v. *Gordon*, 422 Mass. 816, 849 (1996), and cases cited. We do so once more today.

The defendant contends that this view was a demonstrative aid and therefore was so different from an ordinary view as to require his presence at what the defendant contends was a critical stage of the trial. We agree that this was not a typical view, but we conclude that it was still a view for all intents and purposes, in that no testimony was taken or demonstration performed, and the jury were instructed that the purpose of the view was to assist them in understanding the evidence at trial. If the automobile could have fit into the court room, the Commonwealth would have been permitted to use the automobile as a visual aid to help the jury understand the subsequent expert testimony of Lieutenant Martin. Because it would not fit, the jury could see it only through a view. As with a more typical view, the purpose was to allow the jury visually to understand the trial testimony regarding the crime scene.

We also note that the evidence supported the judge's findings regarding the security risk posed by allowing the defendant to be present during the jury view. We consider as well the judge's willingness to make alternative arrangements to accommodate the defendant: she offered to allow the defendant to be escorted to the parking lot to see the vehicle without the jury present and to monitor the jury view through a court house window. In these circumstances, the judge acted well within her broad discretion in imposing reasonable conditions and restrictions regarding the defendant's observation of the visual aid. See *Commonwealth* v. *Evans*, 438 Mass. 142, 151 (2002); *Commonwealth* v. *Mack*, 423 Mass. 288, 291 (1996).[9]

3. *Witness's compelled testimony.* During voir dire testimony, Joseph Valente invoked his privilege against self-incrimination under the Fifth Amendment to the United States Constitution and art. 12. In order to determine whether Valente had a valid privilege, the judge ordered Valente, who no longer resided in

---

[9]Because no demonstration was performed during the view and the automobile plainly could not be brought into the court room, we need not consider whether the defendant's presence would be required if there had been a demonstration or if the view could have been avoided.

Massachusetts at the time of the trial, to testify as to when he had established domicil in Florida.[10] Based on Valente's testimony, the judge determined that Valente had no valid privilege because the statute of limitations as to any criminal liability he may have had as an accessory after the fact to the murder had expired before he moved to Florida. At a subsequent voir dire, Valente's attorney informed the judge that Valente had moved to Florida three years earlier than he had previously testified, which would have meant that the statute of limitations had not run by the date of trial. The judge rejected the attorney's proffer, reminded Valente that he was still under oath, and invited the prosecutor to ask voir dire questions. Valente asked to speak with his attorney, and the judge refused, declaring that he had already had "ample opportunity to consult with his attorney." When Valente invoked his privilege against self-incrimination, the judge ordered him to answer the prosecutor's question and informed him that, if he did not, he would be held in contempt. After Valente agreed to answer questions, defense counsel objected to what he characterized as "the coerced nature" of Valente's testimony. Valente later testified at trial before the jury.

We need not consider whether the judge erred in compelling Valente to testify or in refusing to permit his attorney to confer with him after he had taken the witness stand during the second voir dire, because the defendant has no standing to challenge these rulings of the judge. Valente's privilege, to the degree that it may have survived, belonged only to Valente himself, not to the defendant. See *Commonwealth* v. *Figueroa*, 451 Mass. 566, 578 (2008); *Smith* v. *Commonwealth*, 386 Mass. 345, 349 (1982); *Commonwealth* v. *Rivera*, 37 Mass. App. Ct. 244, 251 (1994).

4. *The prosecutor's closing argument.* Following the Commonwealth's closing argument, the defendant objected to various assertions made by the prosecutor, contending that they were not supported by the evidence. We address each alleged unsupported assertion.

a. The prosecutor told the jury that Valente had "[p]robably" said to the police that the defendant told him after the murder that "$5,000 doesn't go very far." On direct examination at

---

[10]The statute of limitations is tolled for the period that a defendant is domiciled outside of Massachusetts. G. L. c. 277, § 63.

trial, Valente was asked about the police report that described what Valente had told the police about his conversation with the defendant on the night of the murder. The prosecutor asked, "Did you say that [the defendant] said he was scared, alluding to the fact that $5,000 doesn't go far?" Valente replied, "[S]tanding here in front of you now, I don't recall saying that, but if it's in there, I probably said it." The evidence at trial shows that the prosecutor did not err in his closing argument by saying that Valente "[p]robably" made that statement to the police.

b. In the course of his closing argument, the prosecutor described Valente's state of mind during his testimony as follows: "[T]ry as he might to not provide any information for his friend — to this day, I might add — I would suggest he was evasive. You saw it. He didn't want to answer any questions. He wasn't going to give up anything." The defendant argues that Valente never testified that he was still a friend of the defendant. The prosecutor, however, did not state that Valente remained a friend "to this day," but that Valente, "to this day," tried not to provide information that may hurt his "friend." Valente testified at trial that he and the defendant became friends before the murder and remained friends even after their business relationship had ended. While Valente denied feeling any loyalty or friendship at the time he spoke to the police, the evidence permitted the prosecutor reasonably to argue that Valente was being evasive when he spoke with the police, and in his testimony at trial, because the defendant had been Valente's friend and he did not want to help in convicting him.

c. The prosecutor told the jury that the victim's mother testified that "she saw two people running, chasing [the victim] . . . as they chased him out . . . towards the car." The defendant claims that the victim's mother never testified that she saw her son being chased toward the vehicle and that the prosecutor therefore misrepresented her testimony to the jury for the purpose of magnifying its emotional impact.

The victim's mother testified that, just before midnight on the night her son was killed, a person she did not know (whom the evidence suggested was Tessier) came to her home and asked her son to help him because "they" were after him. She then heard a number of persons running around her house and banging on the back door. The victim said he was "going out" and left through

the front door. She looked out the window and saw her son and two "kids" running in the same direction — to the right of her house, in the direction of the park.

In short, the evidence supported the prosecutor's statement that the victim's mother saw her son being chased by two people. The defendant is correct that she did not say that she saw the victim being chased "towards the car." The prosecutor, however, did not state that the victim's mother saw her son being chased toward the vehicle; he simply argued that the jury could infer that this was the direction they were running because the victim ultimately ended up in the vehicle. Indeed, the jury could not reasonably have understood the prosecutor to have said that the victim's mother saw her son being chased "towards the car," because she would not have known at that time that the "kids" she described had come to her house in a particular vehicle. The prosecutor did not misrepresent the testimony of the victim's mother.

d. Finally, the prosecutor told the jury that Brian Madden telephoned his brother, Mark, at approximately 12:30 A.M. just after the shooting, and then telephoned the police from his house minutes later. The defendant argues that there was no evidence that the emergency call placed to the police was made by Brian Madden. At trial, the police civilian telephone operator who answered the call testified that it was made by an unidentified male, who said in an excited voice that there had been a shooting, that he wanted a detective sent to a particular address (which was that of Brian Madden's home), and that the caller "was going to be there." Mark Madden testified that Brian telephoned him shortly after midnight from his home, that he told Brian to "stay there," and that he then went immediately to Brian's house.[11] When Mark arrived at Brian's home about two minutes later, Brian and his wife were there, and police officers had arrived. From this evidence, the jury reasonably could have inferred that either Brian or Mark telephoned the police. Because Mark Madden did not testify that he telephoned the police, the more reasonable inference was that Brian did. Consequently, the prosecutor's argument that Brian made the telephone call rested

[11]The prosecutor wished to elicit testimony from Mark Madden that he told Brian Madden to telephone the police, but the judge sustained the defendant's objection to this testimony.

on reasonable inferences from the evidence. See *Commonwealth v. Jones*, 432 Mass. 623, 628 (2000) (inference drawn by prosecutor from evidence "need not be necessary and inescapable, only reasonable and possible").

For these reasons, we conclude that there is no basis on which to find that the assertions the defendant challenged in the prosecutor's closing argument were improper. All were reasonably supported by the evidence and by reasonable inferences drawn from the evidence.[12]

5. *The* Cunneen *factors.* The defendant claims that the judge erred in failing to instruct the jury that, to find the defendant guilty of murder in the first degree on a theory of extreme atrocity or cruelty, they must unanimously find one of the factors set forth in *Commonwealth v. Cunneen*, 389 Mass. 216, 227 (1989). The jury need not unanimously agree on which of the *Cunneen* factors they have found in order to convict a defendant of murder in the first degree on a theory of extreme atrocity or cruelty, because "these factors are 'evidentiary considerations,' not elements of the crime or separate theories of culpability." *Commonwealth v. Obershaw*, 435 Mass. 794, 809 (2002), quoting *Commonwealth v. Hunter*, 427 Mass. 651, 656-658 (1998). There was no error.

6. *Conclusion.* We affirm the judgment of conviction and, based on our review of the record, find no reason to exercise our power under G. L. c. 278, § 33E, to grant the defendant any other relief.

*So ordered.*

---

[12]The defendant also argues that the prosecutor erred in telling the jury that the defendant gathered his belongings and closed his bank accounts before leaving Brockton on the night after the murder, but the prosecutor immediately corrected himself in front of the jury, saying "no evidence of that." Because the error was promptly corrected, it was harmless.

Finally, the defendant claims that the prosecutor improperly injected opinion in his closing argument when he said that one witness, Maida Edmond, became a substance abuse counsellor because she saw "people walk the path of drugs and end up like [the victim]" and that another witness, Travis Merritt's mother, who also overheard the defendant say that he had killed someone, cried on the witness stand because she did not want to testify against the defendant. The defendant did not object at trial to these statements, and we need not address them because, even if they were error, they posed no risk of a miscarriage of justice.