Agnes, Peter W., J.
1. Introduction. The defendant, Erik Rodriguez, is charged with murder, armed assault with intent to commit murder, and various firearm offenses in connection with the shooting death of Nelson Ortega on July 3, 2008. The defendant was arrested at his place of employment in Fitchburg on July 22, 2008. The defendant has filed a pretrial motion to suppress statements he made while in police custody. Based on the credible evidence presented at the hearing on the defendant’s pretrial motion to suppress, I make the following findings of fact and rulings of law.
2. Findings of fact. The parties agree and stipulate that during all relevant times on July 3, 2008 the defendant was in police custody. The arrest of the defendant on July 3, 2008 was not his first encounter with the police. The defendant was arrested by Sergeant Stanley Barrey of the Lunnenburg Police Department on July 3, 2006 based on the discoveiy of illegal drugs in his automobile. At the police station, the defendant was read his Miranda warnings from a wall chart and given a so-called Miranda card to read. The defendant read the card and appeared to understand it. See exhibit 2 (defendant’s 2006 booking sheet).
3. David Cravedi is a detective with the Massachusetts State Police. On July 22, 2008, Detective Cravedi was working out of office space located at 19 Mid State Drive in Auburn. Building number 19 is part of a complex of six buildings. There are signs on the door and in the lobby identifying certain space as belonging to the Massachusetts State Police. Detective Cravedi is the “case officer” on the Nelson Ortega murder investigation. Numerous witnesses reported to the *309 police that the defendant was at the scene of the July 3, 2008 shooting of Ortega at 24 Congress Street. See exhibit 3 (map showing location of the shooting). One of the other persons suspected of involvement in the shooting, Ryan O’Neil, was himself shot and taken to the hospital for treatment. At least one witness told the police that the defendant put on a glove, pulled out a handgun from underneath his sweatshirt, and handed it to a third-party, Santiago, who in turn fired the shots that killed Ortega. Another witness also told the police that she saw the defendant standing over Ortega’s body after the shooting and that the defendant was taunting him as he lay bleeding on the sidewalk. There is a marked difference in appearance between the defendant and Santiago; the former is about six feet two inches tall and 225 pounds, while defendant Santiago is about five feet six inches tall and 140 pounds. The shooting took place about fifty yards away from the defendant’s home.
4. On July 22, 2008, the defendant was arrested at his place of employment by State Police Detective John J. Boland, Jr., a 3 1/2-year veteran of the Massachusetts State Police with prior military experience in the field of drug interdiction. The defendant was brought to the state police office in Auburn. Detective Boland and another trooper interviewed the defendant. The interview took place in a small, windowless office. The interview was audio-taped and videotaped. See exhibit 1.1 have reviewed the audio and video-recorded interview. The defendant was advised of his Miranda warnings by Trooper Boland who read the Miranda rights from a card. The defendant acknowledged his rights and answered affirmatively when asked if he wished to speak to the police. The defendant signed the rights card. The card is in evidence. See exhibit 4. The defendant also was advised of his telephone rights. The police assisted the defendant who tried to make several telephone calls from the land line that was in the office. Eventually, the police gave the defendant his cell phone and he was able to retrieve the telephone number he intended to call and was able to dial it successfully using the police department land line.
5. After speaking by telephone (in both English and Spanish) to several persons, including his mother, the defendant told the police that his mother had informed him that an attorney was on the way to the police station. The police informed the defendant that he had the right to decide whether to continue the interview or to wait for the attorney. The defendant said he did not know what to do. The police responded by stating that they already had completed the investigation, knew that the defendant was present at the scene, and simply wanted to know what the defendant’s purpose was. The police also suggested that other people had given their account of the shooting and that this was an opportunity for the defendant to explain his side. The defendant denied that he was present at the scene. The interview came to an end a short time later. Detective Boland then telephoned Trooper Daniel Riopel to come to Auburn to pick up the defendant and to transport him to the State Police barracks in Holden.
6. Before Trooper Riopel arrived to pick-up the defendant, the defendant asked to speak to Trooper Boland. The defendant was advised of his Miranda rights a second time and was asked to return to the interview room so that their conversation would be recorded. The defendant refused to be audio-or video-recorded. He insisted on talking to the police. A further conversation took place between Trooper Boland and the defendant. The defendant was alert, did not exhibit any signs of intoxication or impairment. The defendant stated that Ivan Villot-Santiago, his cousin, had guns or a gun on the night of the shooting and produced it just before the shots were fired. The defendant said he left the scene and went to a relative’s home on Pacific Street, not to his home on Congress Street. He also indicated that he heard shots that he thought were fired by Ivan, but was not sure of that. Trooper Boland again asked the defendant to make a recorded statement. The defendant asked to make another telephone call. He appeared to speak to his two young children and began crying. The defendant said “I can’t talk to you.” There was no reference to an attorney. Trooper Boland then called for Trooper Riopel to come back to Auburn to pick up the defendant. Trooper Riopel arrived and did transport the defendant to the State Police barracks in Holden. The defendant appeared to be calm at this point and made some small talk about baseball during the drive to Holden.
7. Ridings of law. There are two periods of time when the defendant was subjected to custodial interrogation each of which requires a separate analysis.
7(A). Initial recorded interview. The general rule in Massachusetts is that a person in police custody must make a clear statement that he or she wishes to consult with counsel in order to invoke the right to counsel under Edwards v. Arizona, 451 U.S. 477 (1981). See Commonwealth v. Morganti, 455 Mass. 388, 396-98 (2009), discussing and applying Davis v. United States, 512 U.S. 452 (1994). In Morganti, the Supreme Judicial Court held that a defendant undergoing police custody who remarked that he thought he might need a lawyer and might want to talk to the lawyer before talking further to the police had not made an unequivocal request for counsel that called for the termination of the interview. However, it’s important in applying the totality of the circumstances test to both the question of a valid waiver and the question of voluntariness to examine the entire picture. In Morganti, the trial judge found that immediately after making the equivocal comment, the defendant resumed the interview and said he would be more comfortable talking in another room. Morganti, 455 Mass. at 394. After traveling to another *310 location with the police and sharing a meal together, the defendant participated in a brief recorded interview which quickly ended when he said “I think I would rather take my chances on a lawyer . . .” Id. at 396. Up to this point, the trial judge reasoned that the defendant’s statements were voluntary and in compliance with Miranda. The Supreme Judicial Court concurred:
When a suspect’s statement, as here, simply reflects his musing about the possibility of stopping the questioning until he has spoken with an attorney, we have consistently found the statement to be too ambiguous to constitute an unequivocal invocation of the right to counsel. See, e.g., Commonwealth v. Dubois, 451 Mass. 20, 25 (2008) (“This sounds serious. Maybe I better get a lawyer”); Commonwealth v. Jones, 439 Mass. 249, 258 (2003) (defendant stated that he was “going to need a lawyer sometime”); Commonwealth v. Peixoto, 430 Mass. 654, 657-58 (2000) (defendant expressed uncertainty as to whether he wanted to speak to police without attorney); Commonwealth v. Todd, 408 Mass. 724, 726 (1990) (defendant “wondered aloud about the advisability of having a lawyer”); Commonwealth v. Corriveau, 396 Mass. 319, 331 (1985) (“It’s beginning to sound like I need a lawyer”). See also Commonwealth v. Hussey (No. 1), 410 Mass. 664, 671, cert. denied, 502 U.S. 988 (1991) (defendant’s statement that “he had nothing else he could say,” coupled with his “thinking out loud” about whether he should talk or “shut . . . up,” did not amount to invocation of right to cut off questioning).
Morganti, 455 Mass. at 398.[1]
The present case differs from Morganti, but is controlled by the same underlying legal rule. In the present case, after speaking to his family on the telephone, the defendant told the police a lawyer was on the way to see him. The defendant did not say, directly or indirectly, that he wanted to end the interview or that he wished to suspend it until his lawyer arrived. The defendant’s statement that he believed a lawyer hired by his family was on his way to the station was not a clear and unequivocal assertion of the right to counsel that required the police to cease questioning any more than the reference to counsel in Morganti Under current Massachusetts law, the burden was on the defendant to clearly and unequivocally assert his right to counsel. See Commonwealth v. Collins, 440 Mass. 475, 479 n.3 (2003) (responsibility for invoking Miranda rights rests with the defendant). The defendant did not do so. However, when the police stated that the .defendant had the right to stop questioning at any time, the defendant remarked that he was not sure what he should do. An expression of uncertainty about whether to assert one’s rights is a crucial moment in an interrogation. The better practice is for the police to seek some clarification of whether the defendant wishes to continue with the interrogation. A simple and direct way to do this is to ask a question such as: “Sir, do you wish to continue to answer our questions or should we end the interview right here; it’s up to you?” Here, the police explained that they knew the defendant was present at the scene and had interviewed a number of witnesses, including eyewitness, and were interested in knowing what led the defendant to become involved in the events in question i.e., the shooting. Although the police did not follow the better practice by seeking to clarify whether the defendant wanted to continue the interview, the law does not forbid them from continuing to ask questions. The police did not supply the defendant with false information, did not minimize the seriousness of the charges or the defendant’s involvement in the case, did not suggest that the defendant would gain an advantage or obtain leniency by speaking, but suggested broadly that it would be better to answer their questions. This is not a case in which the defendant was impaired by alcohol or drugs, or suffering from a mental health problem or a physical injury. The defendant was not deprived of food, drink or sleep, nor subjected to prolonged interrogation. Although the interrogation tactic used by the police in this case was calculated to extract an incriminating response, the police did not engage in coercion, deception, or trickery. The reasoning underlying the view that the police are allowed to encourage a person to speak by suggesting in a general way that it is better to tell the truth, without more, is “devoid of any implication that doing so would result in more lenient treatment.” Commonwealth v. Brandwein, 435 Mass. 623, 634 (2002).[2]
In the present case, there was no clear invocation of the right to counsel by the defendant nor any coercion by the police that overcame the will of the defendant. The defendant may have made a poor choice from his standpoint in deciding to participate in the interview, but the law does not protect the defendant from poor choices so long as such choices are not the product of coercion or other unlawful conduct. Based on a consideration of the totality of the circumstances, the evidence establishes beyond a reasonable doubt that the police scrupulously observed the defendant’s rights and that his statements were voluntary. Accordingly, I deny that portion of the defendant’s motion to suppress.
7(B). Second unrecorded interview. The initial interview took place at approximately 4:30 p.m. See exhibit 4. The second, unrecorded interview occurred around 6:00 p.m. or sometime thereafter which was more than one hour after the termination of the initial interview. Based on the above findings of fact, this second conversation was initiated by the defendant who asked that it not be recorded. The defendant did not ask for or make any reference to an attorney. The evidence establishes beyond a reasonable doubt that the defendant understood and waived his Miranda rights and *311 that his statements were voluntary up to the point where he made another phone call, became emotional and said he could not talk.
CONCLUSION
For the above reasons, the defendant’s motion is DENIED. The defendant’s videotaped statement to the Massachusetts State Police while in their custody in Auburn on July 22, 2008 is available for use at trial. However, since voluntariness is certainly a live issue in this case, the trial judge should follow the “Humane practice” and submit that issue to the jury for its own independent review. Also, the defendant’s unrecorded statement to the State Police made thereafter before he was transported to Holden is not suppressed and is available for use at trial.

 It is important to note that in Morganti, the Court also added that when a defendant undergoing police interrogation makes an equivocal reference to counsel, it is “good police practice” to ask clarifying questions as suggested by the Supreme Court in Davis v. United States. Morganti, 455 Mass. at 398 n.6.

 The law in Massachusetts is that “[a]n officer may suggest broadly that it would be better for a suspect to tell the truth, may indicate that the person’s cooperation would be brought to the attention of the public officials or others involved, or may state in general terms that cooperation has been considered favorably by the courts in the past. What is prohibited, if a confession is to stand, is an assurance, express or implied, that it will aid the defense or result in a lesser sentence.” Commonwealth v. Meehan, 377 Mass. 552, 564 (1979), cert. dismissed, 445 U.S. 39 (1980). Accord, Commonwealth v. Jordan, 439 Mass. 47, 53 (2003) (“The touchstone is whether the police ‘assured’ the defendant that his confession would aid his defense or result in a lesser sentence”); Commonwealth v. Cunningham, 405 Mass. 646, 658 (1989) (Defendant’s waiver of Miranda was not rendered involuntary as a result of statements made by police detective and a priest that it would be better if he told the truth).