COMMONWEALTH *vs.* EDWARD HUSSEY (No. 1).

Essex. February 5, 1991. - July 15, 1991.

Present: LIACOS, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Arrest. Constitutional Law*, Admissions and confessions, Waiver of constitutional rights, Assistance of counsel, Self-incrimination. *Evidence*, Admissions and confessions. *Waiver. Practice, Criminal*, Assistance of counsel, Capital case.

In a murder case, the record of a hearing on the defendant's motion to suppress his confessions did not demonstrate that the defendant had expressed an unwillingness to continue being questioned by the police or that he had made an affirmative request for an attorney, after he had waived his rights to remain silent and to the presence of an attorney. [670-673]

INDICTMENT found and returned in the Superior Court Department on January 18, 1989.

A pretrial motion to suppress evidence was heard by *John T. Ronan*, J., and the case was tried before him.

· *Dana A. Curhan* for the defendant.

*Robert J. Bender*, Assistant District Attorney, for the Commonwealth.

O'CONNOR, J. A judge in the Superior Court denied the defendant's motion to suppress his incriminating statements made while he was in police custody. Thereafter, the case was tried to a jury, the statements were admitted in evidence, and the defendant was convicted of murder in the first degree. On appeal, the defendant argues that the failure of the police officers to honor his invocation of the right to remain silent and the right to have counsel present during custodial interrogation violated his State and Federal constitutional rights, and that therefore his motion to suppress should have been allowed. We do not agree. Also, we deny

the defendant's request to reduce the verdict under G. L. c. 278, § 33E (1990 ed.). We affirm the conviction.

At the time that the defendant gave the statements in question, he was a suspect in connection with three separate incidents. One of those incidents eventually led to three Essex County indictments charging the defendant with armed robbery of John Reilly, assault with intent to murder Reilly, and assault and battery by means of a dangerous weapon on Reilly. Another incident led to a fourth Essex County indictment of the defendant, an indictment for the murder of Joseph Baker. That indictment resulted in the conviction that is the subject of this appeal. The third incident involved the murder of Paul Kelly. A Middlesex County grand jury indicted the defendant for that murder, and the defendant was convicted and appealed. We deal with that appeal in a separate case decided today. *Commonwealth* v. *Hussey (No. 2)*, *post* 1007 (1991). In connection with all five indictments, the defendant filed motions to suppress his statements. The several motions were the subject of a single hearing, and the parties agree that the judge's findings, rulings, and conclusions based on that hearing apply to all of the indictments.

We recite the motion judge's findings as they relate to this case. In the late evening of December 1, 1988, a Gloucester police officer, responding to an armed robbery report, found John Reilly, who had been beaten. Following conversations with Reilly, the officer arrested the defendant at another location and orally advised him of his Miranda rights. Soon thereafter, a detective Aiello recited the Miranda warnings to the defendant again, and the defendant was taken to the Gloucester police station.

At the station, the detective read a Miranda card and then gave it to the defendant and asked him if he understood it. The defendant responded that he did and, in compliance with the detective's request, he signed it. In response to the defendant's inquiry, the detective told the defendant the crimes with which he was being charged (relating to the victim Reilly), and the detective asked the defendant for "his . . . side of the story." At that point, the defendant "was given

the right to use the telephone, and [he] thereupon accepted that invitation to use the telephone and called his 'business partner.' Thereafter the detective undertook some specific inquiry. [The defendant] denied any wrongdoing, stating, 'I had nothing to do with it.' Notwithstanding that the detective pointed out that [the defendant] was covered with blood himself and that his clothes were bloodied and so was the laundry room in which he was captured, [the defendant's] demeanor remained calm, cool and collected. He gave no manifestation of being under the influence of alcohol or drug abuse. [The defendant] . . . explained that he was merely washing his clothes because they smelled and that the blood had come from an injury, a blister upon his hand."

According to the judge's findings, the local police summoned the State police to the police station because Reilly's survival was in doubt. State police officers Kelleher and Condon came to the station and assumed control of the case. Kelleher began by asking the defendant if he had been given his Miranda warnings, and the defendant said that he had, and confirmed that he had signed the Miranda card and understood his rights. One of the troopers told the defendant that they were aware that he claimed that the blood on his person and clothes had come from a finger blister or injury. Trooper Kelleher expressed doubt that a blister could have caused so much bloodiness, and Trooper Condon told the defendant that photographs would be taken at the scene of the robbery and chemical tests carried out. Kelleher explained that, if the defendant's blood were found at the scene or if the victim's blood were found on the defendant, the defendant "was going to be very hard put to explain it." Then the troopers spent a few minutes asking general questions about the defendant's background, after which they started to make specific inquiry about the armed robbery.

The judge found that, "[w]hen they got to the specifics . . . the defendant hesitated and fell silent. Trooper Kelleher observed him and his demeanor change and said, 'I know that you're thinking about what you should do. Well, take your time.' At this point, the defendant fixed his gaze on the floor.

After a few moments he stated, 'Part of me wants to tell you what happened; and, part of me tells me to shut . . . up.' The troopers said nothing. The troopers waited. A few minutes later, without ever having lifted his eyes from the floor, [the defendant] posed a question, a what if question. He said, 'What if you said something but it turned out to be more than you intended, would you go to jail?' It was Trooper Condon who replied, 'Well, we don't decide that, courts do, and it really depends on what the person did.' For a few moments the defendant remained quiet, and then he stated that he wanted to use the telephone. Kelleher . . . gave the phone over to [the defendant] [who] dialed a number. After he did, while he had the receiver in his hand, Kelleher asked, 'Whom are you calling?' [The defendant] replied, 'An attorney.' The trooper said nothing further. And after a significant time period in which nothing happened, [the defendant] said something to the effect of 'no answer,' or 'it was a business number.' In any event, he hung down the receiver. The troopers said nothing. Kelleher, however, retrieved a telephone book from a nearby area and gave it to [the defendant.] [The defendant] started to page through it, or flipped through it, and then he closed it and pushed it aside. He said, 'I'm not going to wait. All right. I'll tell you what happened.'

"Thereafter, from one twenty-five a.m., to nearly three o'clock or quarter of three in the morning [December 2, 1988], Trooper Condon recorded, as nearly verbatim as she could, what really was a monologue that was uttered by [the defendant]. . . . And after the statement was concluded, [the defendant] was asked to examine this memorandum and to verify its authenticity. [The defendant] appeared to read it over and he confirmed it as to accuracy and he signed it. . . . It was 2:40 in the morning.

"[A]t about 2:30 a.m., Gloucester Police Shift Commander Reardon rapped on the door of this interrogation room and asked Kelleher to step outside. When he did, the sergeant told him that one Sean Smith was being questioned by the police and had just implicated [the defendant] as in-

volved in two separate and unrelated murders. Kelleher immediately returned to the task at hand, went back into the room and finished taking the defendant's statement regarding the armed robbery of Reilly. . . . At the conclusion of [the defendant's] statement he was subjected to photographing, some other testing, and then placed in a holding cell on the lower floor of the Gloucester Police House. His clothing was taken from him and he was given merely a blanket with which to clad himself."

After Sergeant Reardon had received information from Sean Smith about the defendant's possible involvement in two homicides, one of which took place in Middlesex County, Reardon alerted the office of the Middlesex County district attorney, and two more State troopers, Troopers Lawless and Cahill, were directed to the Gloucester police station. They arrived there in the predawn hours of December 2, 1988, and they, along with Trooper Kelleher and others, interviewed Sean Smith. Smith gave the officers a detailed statement describing how the defendant had killed Paul Kelly in Middlesex County and Joseph Baker in Gloucester (Essex County). Then, shortly after 5 A.M., Trooper Lawless encountered the defendant. The two men had met previously, on November 11, 1988, when Lawless interviewed the defendant about the death of Paul Kelly. At the December 2 interview, Lawless read a Miranda card to the defendant, gave it to him, and asked him to read it. The defendant looked at the card and returned it to Lawless. "Then," the judge found, "Lawless asked [the defendant] if what [the defendant] had told Lawless on November 11th, that he dropped off Paul Kelly at a railroad station, was true or untrue. Lawless then asked, 'Didn't you drive Kelly to Fryeburg, Maine?' and pursued it quickly with two other inquir[ies]: 'Didn't you get stuck in the mud when you did so?' and 'Didn't you drive to Carlisle?' [The defendant] answered quietly each inquiry, 'I don't know what you're talking about.'

"It was at about this juncture that Sergeant Reardon, who up to this point had been present but passive, said, 'When daylight comes, we are going to leave this station with Sean

Smith and we are going up to the area known as Dog Town Common. We will go up there and we will park our cruiser near a set of metal gates. We will walk about a mile and a half into the woods until we come upon a rock with paint on it.' . . . 'At that place we will find the body which will be lying face down,' and [Reardon] described the condition of the body that would be discovered as having its vertebrae exposed." The motion judge then found as follows: "It was at this point that [the defendant] said, 'I have been had. You would never have had that information unless Sean told you.' The defendant was reflective and quiet for a moment thereafter and then muttered, 'Give me a gun and I'll end it for you guys right now.' It was at that point that the defendant said that he would tell the police all and, incidentally, that Sean Smith was involved as well. Indeed, for the next hour, he did just that. Lawless, Reardon, Cahill, [and] Aiello were present and listened. . . . At the conclusion of the Lawless interrogation, a stenographer was brought into the room and [the defendant] repeated his statement, acknowledging that he had been given his Miranda rights and waived the same and stating, in essence, o[n] the stenographic record all that he had before; that he was not under the influence of drugs or liquor and that no promises or threats had been made to obtain the statement. And he detailed and described the circumstances surrounding the Baker and Kelly slayings . . . . During all of the interrogation at the Gloucester Police House on December 1 and 2, 1988, [the defendant] was well oriented as to time, place and circumstances. In these interviews, each, all and every, he was calm, collected and composed. He was alert and sober and he never gave any manifestation of being under the influence of any drug or alcohol. He did not request counsel, nor at any time did he seek to terminate or end the interrogation."

On the basis of his findings, which in relevant part have been set forth above, the motion judge ruled that the defendant's incriminating statements had been made after "a knowing, voluntary and intelligent waiver" of his Miranda rights, that "Troopers Kelleher and Condon scrupulously honored

the [defendant's] right to counsel and did not interfere, intrude or hamper the same," and that the statements were voluntary in the due process sense. Accordingly, he denied the several suppression motions.

In his brief, the defendant directs our attention to testimony given by Trooper Condon at the suppression hearing that was not reflected in the judge's findings. Trooper Condon testified that, after the troopers told the defendant that they were aware that the defendant had claimed that the blood on his hands and clothes had come from a cut he had, they told him that they felt there was something else the defendant was not telling them. In response, according to Condon's testimony, the defendant said that "he had nothing else that he could say." It was after that statement by the defendant that, as the judge found, the troopers asked the defendant general background questions and told the defendant that a chemist would be conducting blood tests and that photographs would be taken. Condon testified that after the reference to the chemist, Trooper Kelleher said, "You know, I can see that you're thinking about something. Take your time and think about it, and why don't you tell us what happened?" Condon also testified that it was then that the defendant "put his head down and he sighed and he said, 'One part of me wants to tell you what happened; the other part of me says I should shut . . . up.' "

The defendant makes two arguments. The first is that he clearly and unequivocally invoked his right to terminate the interrogation by telling the troopers that he had nothing else to say about the armed robbery of John Reilly, and by his "remarks in which he debated out loud whether to talk or to 'shut . . . up.' " As a result, he contends, his constitutional right to remain silent was violated both by the troopers' subsequent questions about the robbery and those about the murders as well. The defendant's second argument is that he invoked his right to. counsel (and therefore his right to remain silent without the advice and presence of counsel) by telling the troopers he was trying to speak to an attorney by telephone, and he never thereafter waived that right.

The judge was clearly warranted in finding, with respect to the defendant's initial denials of involvement in the armed robbery and other offenses against Reilly, that the defendant waived his rights to remain silent and to the presence of counsel. The defendant does not contend otherwise. However, "a defendant has not only the right to remain silent from the beginning but also a continuing right to cut off, at any time, any questioning that does take place." *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 265 (1982). In order to invoke that continuing right, a defendant "must 'indicat[e] in [some] manner' that he is invoking the right he previously waived." *Id.*, quoting *Miranda* v. *Arizona*, 384 U.S. 436, 473-474 (1966). That may be accomplished by "either an expressed unwillingness to continue or an affirmative request for an attorney." *Commonwealth* v. *Pennellatore*, 392 Mass. 382, 387 (1984). The defendant says both things — that he expressed his unwillingness to continue, and that he affirmatively requested an attorney.

Even if the defendant told Troopers Kelleher and Condon, after he denied his involvement in the armed robbery of Reilly, that "he had nothing else he could say," as testified to by Condon, that statement, supplemented by the defendant's "thinking out loud" about whether he should talk or "shut . . . up," falls far short of constituting an expression of unwillingness to continue to be interviewed by the police. Those statements show no more than the defendant's reaffirmation of his noninvolvement in the robbery and his momentary indecision, later resolved, about whether to exercise his known right to silence. These statements are not enough to qualify as the invocation of a right to cut off questioning. See *Commonwealth* v. *Roberts*, 407 Mass. 731, 733-734 (1990) (defendant's refusal to reply to certain questions was not an assertion of his right to remain silent); *Commonwealth* v. *Pennellatore*, *supra* at 386-388 (in the context of the defendant's willingness to talk both immediately before and after a break in questioning, his words, "Can we stop, please?" were not meant as an assertion of his right to remain silent or to stop the questioning permanently); *Commonwealth* v. *Brad-*

*shaw, supra* at 265 (defendant's words, "I don't want to talk," were insufficient to establish an assertion of his right to halt further questioning when, without any more encouragement than the question, "And then what?" the defendant continued speaking).

Also, the defendant did not invoke his previously waived Miranda rights by making an affirmative request for an attorney. See *Commonwealth* v. *Pennellatore, supra* at 387. The defendant argues that his exercise of that right was "reasonably apparent from his statement to the officers while making a telephone call that he was calling an attorney." In support of his position, the defendant cites *United States* v. *Porter,* 764 F.2d 1 (1st Cir. 1985), and *Commonwealth* v. *Zook,* 520 Pa. 210 (1989). Both of those cases are distinguishable from the present case. Perhaps the primary distinction, one that makes enough of a difference to call for different results, is that, here, after the defendant attempted unsuccessfully in the presence of the police to reach his attorney, the defendant pushed aside a telephone book that had been proffered to him and, without police pressure, subtle or otherwise, said, "I'm not going to wait. All right. I'll tell you what happened." Those facts were not present in the cases on which the defendant relies, and they clearly justify the conclusion arrived at by the motion judge that the defendant's statements were made after the defendant's voluntary waiver of his right to counsel. We conclude that the defendant's motion to suppress was correctly denied.

The defendant requests that, if we reject his suppression argument, we exercise our power under G. L. c. 278, § 33E, to reduce the verdict. He calls our attention to evidence that the defendant, twenty-one years old at the time of the offense, had had a troubled family life, that he had been living in difficult circumstances, and that the conduct of which he was found guilty was due in large part to significant pressure put on by him by Sean Smith. "Our review will be limited to ascertaining 'whether, absent intervention, there exists a substantial risk that a miscarriage of justice will occur.' " *Commonwealth* v. *Bradshaw, supra* at 259-260, quoting *Com-*

*monwealth* v. *Monsen*, 377 Mass. 245, 246 (1979). We have reviewed the entire case on the law and the evidence and we are not satisfied that we should exercise our power either to order a new trial or to reduce the degree of guilt.

*Judgment affirmed.*