NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11177

COMMONWEALTH vs. DAVID W. VINCENT, THIRD.

Berkshire.     April 11, 2014. - October 14, 2014.

Present:  Ireland, C.J., Spina, Gants, Duffly, & Lenk, JJ.[1]


Homicide. Practice, Criminal, Motion to suppress, Admissions and confessions, Voluntariness of statement, Assistance of counsel, Arraignment, Delay in commencement of prosecution, Waiver, Capital case. Evidence, Admissions and confessions, Voluntariness of statement. Constitutional Law, Admissions and confessions, Voluntariness of statement, Assistance of counsel, Waiver of constitutional rights, Delay in commencement of prosecution. Due Process of Law, Assistance of counsel, Delay in commencement of prosecution.



Indictment found and returned in the Superior Court Department on July 24, 2009.

A pretrial motion to suppress evidence was heard by John A. Agostini, J.; the case was tried before him; and a motion for a new trial was considered by him.


Greg T. Schubert for the defendant.
John P. Bossé, Assistant District Attorney, for the Commonwealth.


---

[1] Chief Justice Ireland participated in the deliberation on this case prior to his retirement.

DUFFLY, J.  On the morning of June 3, 2009, police received reports from staff at a regional medical center in Pittsfield that a woman had been admitted with life-threatening injuries that might have resulted from a domestic dispute.  The woman, Rebecca Moulton, was the girl friend of the defendant.  Early that afternoon, the defendant went to the Pittsfield police station; after an initial interview with police, which was not recorded at his request, he was arrested for aggravated assault and battery.  In a subsequent interview that he requested after booking, again not recorded at his request, the defendant made additional incriminating statements.  Moulton died the following day, and the defendant thereafter was arraigned on charges of murder in the first degree.

At trial, the defendant conceded that he had beaten Moulton, but asserted that he had not intended to cause her grievous injury or death.  The theory of defense was that, as a result of his addiction to, and consumption of, large amounts of alcohol, cocaine, and marijuana on the night in question, the defendant lacked the requisite intent to support a conviction of murder in the first degree.  A Superior Court jury found the defendant guilty of murder in the first degree on a theory of extreme atrocity or cruelty.[2]  The defendant's appeal from his conviction

---

[2] The jury did not find the defendant guilty of murder on a theory of deliberate premeditation.  He had been indicted also on

was consolidated with his appeal from the denial of his motion for a new trial.

As does his motion for a new trial, the defendant's appeal focuses primarily on asserted error in the denial of his motion to suppress incriminating statements made during the course of the two police interviews.  He contends that the statements were made after he had invoked his right to an attorney, and that police failed scrupulously to honor that invocation.  He maintains also that the statements were involuntary, and made as a result of intoxication and police coercion.  Finally, the defendant contends that his counsel was ineffective for failing to raise a claim in his motion for a new trial that his right to prompt arraignment had been violated.  The defendant also asks that we exercise our power under G. L. c. 278, § 33E, to grant him a new trial.  After reviewing the entire record pursuant to our duty under that statute, we affirm the conviction and discern no reason to reduce the degree of guilt or to order a new trial.

Events from May 29 through June 4.  We summarize the facts the jury could have found.  In June, 2009, the defendant and Moulton had been in a romantic relationship for at least one year.  Approximately two months earlier, they had moved into an

charges of assault and battery, assault and battery by means of a dangerous weapon, and intimidation of a witness; these charges were placed on file.

apartment in Pittsfield.[3]  The defendant talked to their mutual friends John Sanginetti, Mark Szymanski, and Sara Archer about his relationship with Moulton, conveying that he was jealous of Moulton's relationships with other men and was "paranoid" that she might be cheating on him.  He often took her cellular telephone from her hand in order to check the calls that she had made and received, asked her who had called, and deleted callers' telephone numbers.  On May 29, 2009, Moulton left the apartment she shared with the defendant and stayed for three days at the apartment of her friend Meaghan Rawson.  During this time, the defendant's friends thought he appeared frantic and angry, and was trying to "hunt [Moulton] down"; he frequently called Moulton's cellular telephone and also telephoned Rawson in an effort to locate Moulton.  In several voice mail messages, and in speaking directly to Moulton, the defendant threatened to kill Moulton's pet bird if she did not return to the Pittsfield apartment.  Moulton returned to that apartment on May 31.

Moulton spent the afternoon of June 2 with her brother, shopping for a dress to wear at his upcoming wedding.[4]  They made

---

[3] The apartment was rented by Rebecca Moulton's parents, with the understanding that she would live there.  Because of a prior restraining order, the defendant was not supposed to have any contact with Moulton.

[4] When Moulton tried on the sleeveless dress, her brother noticed bruises on the inside of her upper arm, and commented on them; he took a photograph of the victim wearing the dress to

some additional purchases before he drove her back to her apartment, where the defendant was waiting. Around 6 P.M., Moulton and the defendant purchased alcohol at a nearby liquor store, and a friend arrived with some "crack" cocaine at approximately 9 P.M. Later that evening, Moulton left the apartment and went to Sanginetti's apartment, which was nearby, waking him up; she appeared to be "scared" and "shook up." They talked briefly, and she left a short time later. At some point after midnight, a neighbor in the apartment building heard sounds coming from Moulton's apartment, including a man's voice yelling, "I am tired of you cheating on me," or "why did you cheat on me," and a female voice responding. Another neighbor, in the adjoining apartment, heard repeated banging against the apartments' shared wall.[5]

At 12:39 A.M. on June 3, the defendant telephoned his supervisor and left a message stating that, because he and

_____

send to his fiancée. That photograph, which was admitted in evidence, shows no visible injuries on Moulton's face or head.

[5] Telephone records from Moulton's cellular telephone and from the telephone in her apartment reflect that calls originating from the apartment telephone were placed to her cellular telephone on the evening of June 2, 2009, at 10:20 P.M., 10:55 P.M., 10:56 P.M., 10:57 P.M., 10:58 P.M., and 11:49 P.M. The last call was routed to voice mail. The voice mail recorded for an extended period before it timed out; the originating call from the home telephone was not terminated, however, and it recorded for several minutes the defendant and Moulton arguing. At 12:10 A.M., a call lasting between five to seven seconds was made from the cellular telephone.

Moulton had argued, he would not be at work later that day.  Also around that time, he telephoned the home of his friends Archer and Daniel Delsano and spoke with Delsano.  When Archer heard about the call, she telephoned the defendant and asked him what happened and what "did he do to" Moulton.  The defendant responded that he "didn't do anything," that he had found Moulton unconscious on the floor, and that, when he was unable to wake her, he gave her mouth to mouth resuscitation and pounded on her chest to get her to breathe again.  When the defendant said that he was unable to awaken Moulton, Archer urged him to telephone for emergency medical assistance, but the defendant demurred, stating that "he didn't want to get in trouble" or be blamed.

Between 2:30 and 3 A.M., the defendant telephoned several family members and asked for help; his aunt and a brother came to the apartment in response to one of his calls.  When they arrived, they saw Moulton unconscious on the sofa; they watched as the defendant placed her on an air mattress in the living room.[6]  His brother urged the defendant to telephone for an ambulance, but the defendant indicated his concern that police might think he had had some role in Moulton's injuries.  The aunt

---

[6] During the telephone calls, the defendant made varying statements about the events of the evening, including that he had administered cardiopulmonary resuscitation (CPR) to Moulton when she stopped breathing; that someone had beaten her; that he found her at the bottom of the stairs to the apartment; that he slapped her to wake her up; and that she had woken up and was "okay."

and brother left together twenty to thirty minutes later. At approximately 8 A.M., the defendant called another brother and again asked for help; he said Moulton had been passed out since 2 A.M. This brother arrived at the apartment at about 8:30 A.M. and telephoned 911 after he observed Moulton's condition. He also told the defendant to leave the apartment, and the defendant did so.[7]

Paramedics found Moulton in bed in the bedroom, covered to the neck by a comforter. When the comforter was moved, they observed that her shirt was raised, exposing her abdomen, and that her jeans were largely pulled off, remaining only on one leg. She had extensive bruising on her face and body, which appeared to be "newer . . . but not [having occurred] within the [past] couple hours," and swelling from a contusion on her head. Moulton was transported by ambulance to a nearby hospital, where medical personnel determined that her injuries were likely the result of a beating and contacted Pittsfield police; they informed police that Moulton's injuries were life threatening

---

[7] The subsequent police investigation revealed reddish-brown stains on the kitchen floor, the bedroom carpet, a pillow case found on the living room floor, and other bedding and clothing in the apartment. Deoxyribonucleic acid (DNA) testing of the stain on the pillow case indicated the presence of DNA consistent with Moulton's DNA profile, with the probability of a random match being 1 in 365.6 trillion for the Caucasian population. Stains on a pair of pants found on the bedroom floor revealed DNA consistent with the defendant's DNA profile with the probability of a random match being 1 in 48.08 quadrillion Caucasians. Both Moulton and the defendant are Caucasian.

and, later, that her chances of survival were slim.[8]  Moulton died shortly after noon on June 4, 2009.[9]

2.  Statements to police at issue in motion to suppress. During the early afternoon of June 3, the defendant's mother and father drove him to the Pittsfield police station, arriving at 1:40 P.M.  The defendant was escorted to an interview room where he spoke with Detective Diane M. Caccamo, the lead investigator in the assault on Moulton, and Sergeant Mark Strout.  The defendant was given Miranda warnings, signed a Miranda waiver form, and agreed to speak with the officers but indicated that he did not wish the interview to be recorded.  He also so indicated on the form.  The audio-video recording that had been underway when the defendant entered the interview room was stopped at that point.[10]  Approximately twenty minutes into the interview, the defendant stated that he needed an attorney and stopped talking.

---

[8] Emergency room personnel initially intended to airlift Moulton to a larger medical center but, due to the gravity of her condition, decided that she could not be moved.

[9] The medical examiner determined the cause of death was significant brain injury caused by blunt force trauma to the head.  In addition, there were more than eighty bruises on Moulton's torso, face, and neck, which had been sustained between two and one-half to eight hours prior to her arrival at the hospital.

[10] "We have 'encouraged police to give Miranda warnings prior to the point at which an encounter becomes custodial.'" Commonwealth v. Baye, 462 Mass. 246, 263 (2012), quoting Commonwealth v. Hilton, 443 Mass. 597, 610 n.7 (2005), S.C., 450 Mass. 173 (2007).

At that point, the interview ended; the defendant was arrested and charged with aggravated assault and battery, and was led through the booking process by Officer Tyrone Price.[11]

During booking, the defendant was again informed of his Miranda rights and advised that he had the right to use a telephone. He was asked whether he wished to use the telephone, and answered that he did. After placing a telephone call, the defendant appeared visibly upset and told Price that he wanted to speak to Strout again, responding to Price's question that he wanted to so do without an attorney present. At approximately 3 $\underline{P}$.$\underline{M}$., a second interview was conducted, which the defendant terminated shortly after it began. During the brief interview, the defendant provided additional information concerning the events of the previous night, and stated also that he had consumed two alcoholic beverages, which he later changed to "one and half, possible 24 [ounces]." The interview ended when the defendant said that he did not want to talk about anything else and stopped talking.[12] When police learned on June 4 that the

---

[11] The booking process was video recorded and the recordings were introduced at the hearing on the motion to suppress.

[12] As reflected in those portions of Pittsfield police Detective Diane M. Caccamo's written statement that were introduced at the hearing on the motion to suppress, the defendant stated during the second interview that Moulton struck her head against the doorframe as he dragged her inside, and that he saw blood on the back of her head and on the mattress and bedroom floor. When asked whether he had caused Moulton's

victim had died at 12:15 P.M. that day, the defendant was charged with murder and related offenses.[13]

The defendant moved before trial to suppress statements he made to police during both interviews. An evidentiary hearing was conducted at which Caccamo, Strout, and Price testified. In addition to the officers' testimony, written police reports concerning the defendant's interviews, the video recording of the initial portions of both interviews, and the recording of the booking procedure were introduced in evidence. The motion was denied.

As detailed in the judge's extensive written findings, at three points during the first interview, the defendant made comments musing in some form whether he needed an attorney, or suggesting that he might want a lawyer. In relevant part, the judge found as follows:[14]

> "The initial part of the interview was on video-tape. After the officers identified the nature of the investigation. Vincent stated that he was scared and he 'should probably talk with an attorney -- have a lawyer present.' The officers indicated that they needed to advise

possible skull fracture, the defendant answered, "I hope not," and said that he had not meant to hurt her, but agreed that he was angry at Moulton. The defendant's statements were introduced at trial through Caccamo's testimony.

[13] As noted, all but the murder charge were placed on file after the defendant's trial. See note 2, supra.

[14] In his written findings, the judge did not state explicitly whether he concluded that the defendant was in custody during the first interview.

the defendant of his rights.  Vincent was read his Miranda rights (he also appeared to read along with Det. Caccamo) and he acknowledged these rights by signing a Miranda Rights Form.  He was also advised that the interview would be audio-video recorded unless he declined this procedure. Vincent indicated to both officers that he did not want the interview to be recorded.  Accordingly, the audio-visual recording of the meeting was discontinued.[15]

". . .

"After the video was discontinued, . . . the defendant made a number of statements that were inculpatory, including that he 'slapped Moulton around, shook her up and dragged her violently.'[16]  Vincent explained that he was angry with Moulton for leaving the apartment but he did not beat on her, although the details were 'foggy.'

"During this interview, on three separate occasions, Vincent made comments concerning a lawyer.  After initially stating that he was involved in a physical altercation with Ms. Moulton, Vincent asked the police if he should get a lawyer.  Detective Caccamo explained the choice was his. Without further comment regarding a lawyer, Vincent continued to talk and provide information concerning events that night.

"Within a short period of time he was asked if he would give a written statement documenting the events that night. Vincent responded by stating, 'I don't want to give a

---

[15] The judge found, based on his viewing of the approximately four-minute recorded portion of the interview and the recording of the booking procedure, that "there was no indication that Vincent was intoxicated or impaired in any way."  The judge also credited the testimony by both Caccamo and Strout that there was no odor of alcohol on the defendant's breath and that he did not appear to be intoxicated.  Based on our independent review of the audio-video recordings, we agree that the defendant does not appear to be under the influence of drugs or alcohol.

[16] Caccamo testified that, at that point in the interview, she determined that the defendant would not have been free to leave, and that he ultimately was going to be arrested.

statement.'[17]  He started to talk about the possibility of needing a lawyer.  Sergeant Strout asked, 'Do you want a lawyer?'  Vincent responded, 'I think I might need one.'  Without any hesitation Vincent continued to talk about the incident and stated, 'I didn't intentionally do anything to try to hurt her.  I did drag her into the house and shook her.'

". . .

"As the interview progressed, Vincent stated, 'We might as well get to the nitty-gritty.'  When asked what he meant, Vincent stated, 'I probably shouldn't give a statement until I talked to a lawyer.  I wish I didn't even come in.  It doesn't matter because no matter what, I'm fucked.'  Again, Sergeant Strout said to Vincent, 'do you want a lawyer?'  Vincent answered, 'I guess not.'  At this point, Vincent leaned back in his chair and stated, 'She probably banged her head when I dragged her in.  I think she did.'  He then asked, 'Is there any way you can get me a lawyer?'  Vincent did not wait for an answer and asked about Moulton's condition again.  Sergeant Strout asked Vincent if he wanted a lawyer, however, Vincent did not answer the question and continued to ramble about Ms. Moulton's condition.

"In a few more minutes, after adamantly denying that he tied Moulton up, the defendant, again, asked if he should get a lawyer.  He stated, 'I think I need a lawyer' and stopped talking.  At this point the conversation ended and he was placed under arrest for aggravated assault and battery.  He was taken to the booking desk and he was processed by Sergeant Strout and Officer Tyrone Price."

---

[17] The defendant's trial counsel argued in conjunction with his motion to suppress that the defendant had at that point asserted his right to silence.  The defendant does not raise the question of an invocation of his right to silence on appeal, but we have considered it in connection with our obligations under G. L. c. 278, § 33E.  We conclude that no reasonable police officer in the circumstances would have understood the statement to indicate that the defendant did not wish to speak with police, but rather only to be an assertion that he did not want to make a written statement.  See Commonwealth v. Santana, 465 Mass. 270, 282 (2013), citing Commonwealth v. Clarke, 461 Mass. 336, 342 (2012).

Discussion. The defendant's arguments on appeal center on assertions of error in the denial of his motion to suppress, and the ineffectiveness of his trial counsel in failing to raise other grounds to support that motion. The defendant makes several related arguments to support his contention that all of his statements to police during both interviews should have been suppressed. He argues both that he was in police custody from the moment he appeared at the police station because he was already a suspect, and also that he was in custody at least from the point he told police that he had dragged the victim violently, at which point the lead investigator had made a subjective determination that the defendant was not free to leave. The defendant maintains that, while he was in custody, he unequivocally invoked his right to counsel, but that invocation was not honored. The defendant contends also that his right to prompt arraignment was violated, because he arrived at the police station at 1:40 P.M. on a Wednesday afternoon when the court house was still open, and police therefore were required either to obtain his waiver or to bring him to court for arraignment, which they failed to do, in violation of his right to due process. The prompt arraignment claim was not raised in his motion to suppress or in his motion for a new trial; the defendant asserts on appeal that his trial counsel was

ineffective for having failed to raise the claim in his motion for a new trial.

We begin by addressing the defendant's claims that he was in custody when he unambiguously invoked his right to an attorney.

1. Standard of review. "When reviewing the denial of a motion to suppress, we accept the judge's findings of fact and will not disturb them absent clear error," but "make an independent determination as to the correctness of the judge's application of constitutional principles to the facts as found." Commonwealth v. Tremblay, 460 Mass. 199, 205 (2011). Where a judge's findings are premised on documentary evidence and video recordings, "we are in the same position as the [motion] judge." Commonwealth v. Clarke, 461 Mass. 336, 341 (2012), quoting Commonwealth v. Prater, 420 Mass. 569, 578 n.7 (1995). "To the extent the motion judge made credibility determinations relevant to his subsidiary findings of fact, [however,] we adhere to the normal standard of review." Id.

2. Custodial interrogation. "Miranda [v. Arizona, 384 U.S. 436, 444-445 (1966),] and its protective right to counsel under the Fifth Amendment to the United States Constitution only apply to a custodial interrogation." Commonwealth v. Molina, 467 Mass. 65, 72 (2014). The judge did not address explicitly whether or

at what point the defendant was in custody.[18]  See Commonwealth v.

Groome, 435 Mass. 201, 211-212 (2001) (setting out factors that

must be considered).  However, the judge's findings support his

conclusion that the defendant's statements were preceded by a

valid waiver of his Miranda rights at the outset of the

interview, thereby rendering "insignificant the precise moment in

time when the interview became a custodial interrogation."  See

Commonwealth v. Harris, 468 Mass. 429, 435 n.5 (2014).[19]

---

[18] The judge relied on the conclusion that the defendant did
not have a right to counsel under the Sixth Amendment to the
United States Constitution until he was formally charged.  See
Commonwealth v. Smallwood, 379 Mass. 878, 884 (1980), citing
Brewer v. Williams, 430 U.S. 387, 401 (1977).

[19] Based on our review of the audio-video recording, the
defendant started speaking to the officers immediately after he
entered the interview room, and was interrupted by Caccamo, who
informed him that he was "getting ahead of" himself.  The
defendant then said, "I probably should talk to a lawyer."  The
detective repeated that he was getting ahead of himself and
Strout interjected, saying that because the defendant previously
had been arrested he knew that the officers had to read him his
rights, and that these were procedures applicable to everyone not
just those under arrest.  The officers told the defendant that he
was not under arrest and that they were investigating what had
happened to Moulton.  The defendant nodded to show his
understanding of his Miranda rights when they were read to him,
clearly answered "yes" when asked if he understood those rights,
and, after a moment of thought, waived those rights.

The defendant also signed a Miranda waiver form; a separate
line on that form asked, "Do you understand each of the rights I
have just read to you?"  An "X" appears next to "Yes" beneath
that question, along with the defendant's initials.  The next
line of the form asks, "Having these rights in mind, do you wish
to speak with me now?" and "Yes" is marked, along with the
defendant's initials.  The form is signed by the defendant and
Caccamo.  The form also includes a section that informs a person

3. Invocation of right to counsel. We next address the defendant's claim that police did not heed his assertedly unambiguous invocations of his right to consult with an attorney before answering questions during the first interview.[20] Even were we to assume that the defendant was in custody when he made his statements to police, this would not avail him. The record supports the motion judge's findings that the defendant's statements concerning possibly needing or wanting a lawyer were "ambiguous and equivocal, and would not reasonably be understood in the circumstances to constitute an invocation of the right to counsel." Commonwealth v. Morganti, 455 Mass. 388, 396-397 (2009), S.C., 467 Mass. 96 (2014). See Commonwealth v. Perry, 432 Mass. 214, 232-233 (2000) (judge credited officers' testimony that defendant did not unequivocally request counsel).

During the initial interview, as the judge found, the defendant asked the officers whether he "should get a lawyer," to

_____

being interviewed that it is the department's policy to record all interviews, and asks if the individual wants to have the interview recorded. An "X" appears next to, "NO, I do not want our discussion recorded. I understand that my interview can be recorded if, at any time, I ask that it be recorded." The defendant's signature appears at the bottom of this section, next to that of Caccamo.

[20] Upon arriving in the interview room a second time at 2:57 P.M., the defendant signed the Miranda waiver form indicating that he did not want to have his interview recorded; he began to speak before completing the bottom of the form where the Miranda rights are set forth. The defendant makes no claim that he invoked his right to counsel during the second interview, and there is nothing in the record to suggest that he did.

which Caccamo responded that the choice was his, and the defendant continued to talk. When the defendant started to talk about the possibility of a lawyer, Strout asked him, "Do you want a lawyer?" and the defendant said, "I think I might need one," but, without hesitation, he continued to talk about the incident. Finally, the defendant said that he "probably shouldn't give a statement until I talk to a lawyer," and again Strout asked, "Do you want a lawyer?" The defendant responded, "I guess not," then asked, "Is there any way you can get me a lawyer?" He did not wait for an answer, however, but instead continued to talk. Even when Strout again asked if the defendant wanted a lawyer, the defendant continued the conversation and continued to provide information concerning the events of the previous evening.

As we observed in Commonwealth v. Morganti, supra at 397-399, "When a suspect's statement, as here, simply reflects his musing about the possibility of stopping the questioning until he has spoken with an attorney, we have consistently found the statement to be too ambiguous to constitute an unequivocal invocation of the right to counsel."[21] We conclude that the

---

[21] In Commonwealth v. Morganti, 455 Mass. 388, 397-398 (2009), S.C., 467 Mass. 96 (2014), we cited a number of examples of decisions in which we held that a suspect's statements were too ambiguous to constitute an unequivocal invocation. These included the following: Commonwealth v. Dubois, 451 Mass. 20, 25 (2008) ("This sounds serious. Maybe I better get a lawyer"); Commonwealth v. Jones, 439 Mass. 249, 258 (2003) (defendant stated that he was "going to need a lawyer sometime");

motion judge did not err in denying the motion to suppress on this basis.

4. _Ineffective assistance of counsel_. The defendant argues also that police did not bring him to the court house promptly after his arrest, and that, because his trial counsel did not raise the issue of prompt presentment in his motion for a new trial, he was denied effective assistance of counsel. The thrust of the defendant's claim appears to be that, although he was interrogated within the six-hour safe harbor rule prescribed by Commonwealth v. Rosario, 422 Mass. 48 (1996), because he was not informed of and did not waive his right to prompt arraignment, and was not brought promptly before a judge, his due process rights were violated and suppression of his statements is mandated.

We review the defendant's claim of ineffective assistance "to determine whether there exists a substantial likelihood of a miscarriage of justice, as required under G. L. c. 278, § 33E, which is more favorable to a defendant than is the general

---

Commonwealth v. Peixoto, 430 Mass. 654, 657-658 (2000) (defendant expressed uncertainty as to whether he wanted to speak to police without attorney); Commonwealth v. Todd, 408 Mass. 724, 726 (1990) (defendant "wondered aloud about the advisability of having a lawyer"); Commonwealth v. Corriveau, 396 Mass. 319, 331 (1985) ("It's beginning to sound like I need a lawyer"). See Commonwealth v. Hussey (No. 1), 410 Mass. 664, 671, cert. denied, 502 U.S. 988 (1991) (defendant's statement that "he had nothing else he could say," coupled with his "thinking out loud" about whether he should talk or "shut . . . up," did not amount to invocation of right to terminate questioning).

constitutional standard for determining ineffective assistance of counsel." Commonwealth v. Frank, 433 Mass. 185, 187 (2001). "We therefore consider 'whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion.'" Id., quoting Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C., ante 447 (2014).

Under Mass. R. Crim. P. 7 (a) (1), as appearing in 461 Mass. 1501 (2012), "[a] defendant who has been arrested and is not released shall be brought for arraignment before a court if then in session, and if not, at its next session." Here, the defendant was arrested and detained at approximately 2:14 P.M. on Wednesday, June 3, 2009, and booking procedures concluded prior to 2:57 P.M., a time at which a court presumably would be open.[22] Even if logistical issues prevented the defendant from being

---

[22] The defendant makes no explicit claim that he was interrogated outside the six-hour safe harbor period first announced by this court in Commonwealth v. Rosario, 422 Mass. 48, 56-57 (1996), but appears to raise the issue by his assertion that it is unclear when the second interview ended because police did not record the "actual times" when the defendant requested counsel, when during the second interview he denied police permission to search his apartment, or when applications for criminal complaints were made. The record does, however, reflect that the defendant's first interview commenced at 1:50 P.M., when he had not yet been detained; that the second, apparently shorter interview commenced at 2:57 P.M., only "a short time" after the booking procedure concluded; and that application was made to search the defendant's apartment at some point that afternoon, and a search warrant was thereafter executed at 8:22 P.M. It reasonably may be inferred from this time line that the defendant was not interrogated outside the six-hour safe harbor period.

brought before the court or a magistrate on June 3, nothing in the record explains why the defendant was not arraigned on the next day, June 4. According to the docket sheet, the defendant was not arraigned until Friday, June 5.

"Although the right to prompt presentment is not itself a constitutional one, it serves to protect several constitutional rights afforded to criminal defendants, or at a minimum to inform them of these rights, including the rights to counsel, to be informed of the charges by a member of the judiciary, to reasonable bail, and not to be detained unlawfully." Commonwealth v. Powell, 468 Mass. 272, 276 (2014). As we have expressed, "there is a very real concern that police will delay in presenting an arrestee for arraignment in order to obtain a confession or other inculpatory statements from the arrestee before he or she receives representation." Id. at 277, citing Commonwealth v. Morganti, supra at 399-400. "Delays in presentment thus create both 'opportunity and incentive for application of improper police pressure.'" Id., quoting Commonwealth v. Rosario, supra at 56-57. To address these concerns, we held in Commonwealth v. Rosario, supra at 56, that "[a]n otherwise admissible statement is not to be excluded on the ground of unreasonable delay in arraignment, if the statement is made within six hours of the arrest (day or night), or if (at any time) the defendant made an informed and voluntary written or

recorded waiver of his right to be arraigned without unreasonable delay."  In Commonwealth v. Powell, supra at 277-280, in the face of a challenge by the Commonwealth, we considered whether the Rosario rule had ongoing utility, and concluded that it did, at least "[a]bsent evidence that a delay becomes coercive and unreasonable at a different point."  Id. at 282.

The defendant's statements in this case were made voluntarily, after an effective waiver of his rights to remain silent and to consult with an attorney; there was no suggestion that the statements were made outside the six-hour safe harbor period, and no evidence that police used the delay in presenting the defendant for arraignment to exert pressure on him or otherwise to undermine his will to remain silent.  We therefore conclude that the defendant has not established a serious failure by counsel that resulted in a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Santana, 465 Mass. 270, 280 (2013).

5.  Review pursuant to G. L. c. 278, § 33E.  Having reviewed the entire record consistent with our duty under G. L. c. 278, § 33E, we discern no reason to reduce the verdict to a lesser degree of guilty or to order a new trial.

Judgment affirmed.

Denial of motion for a
new trial affirmed.